BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher (State Bar No. 26202)
 *mblecher@blechercollins.com*
Donald R. Pepperman (State Bar No. 109809)
 *dpepperman@blechercollins.com*
Taylor C. Wagniere (State Bar No. 293379)
 *twagniere@blechercollins.com*
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| BAY AREA SURGICAL MANAGEMENT, LLC, a California Limited Liability Company; BAY AREA SURGICAL GROUP, INC., a California Corporation; FOREST SURGERY CENTER, L.P., a California Limited Partnership; SOAR SURGERY CENTER, LLC, a California Limited Liability Company; KNOWLES SURGERY CENTER, LLC, a California Limited Liability Company; NATIONAL AMBULATORY SURGERY CENTER, LLC, a California Limited Liability Company; LOS ALTOS SURGERY CENTER, L.P., a California Limited Partnership, <br><br> Plaintiffs, <br><br> vs. <br><br> AETNA LIFE INSURANCE COMPANY; UNITED HEALTHCARE SERVICES, INC.; E3 HEALTHCARE MANAGEMENT, LLC.; ALPINE HEALTHCARE, LLC; SILICON VALLEY SURGERY CENTER, L.P.; WAVERLEY SURGERY CENTER, L.P.; BASCOM SURGERY CENTER, L.P.; CAMPUS SURGERY CENTER, L.P.; EL CAMINO AMBULATORY SURGERY CENTER, LLC, <br><br> Defendants. | Case No. 5:15-cv-01416-BLF-NC <br><br> **FIRST AMENDED CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:** <br><br> **1) SECTION ONE OF THE SHERMAN ACT;** <br> **2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **3) INTENTIONAL INTERFERENCE WITH ACTUAL CONTRACTUAL RELATIONS;** <br> **4) CALIFORNIA CARTWRIGHT ACT; AND** <br> **5) BUSINESS & PROFESSIONS CODE SECTION 17200 *et seq.* - UNFAIR COMPETITION** <br><br> **[DEMAND FOR JURY TRIAL]** <br><br> Original Complaint Filed: March 27, 2015 |

Plaintiffs file this First Amended Complaint ("FAC") against defendants Aetna Life Insurance Company, United Healthcare Services, Inc., E3 Healthcare Management, LLC, Alpine Healthcare, LLC, Silicon Valley Surgery Center, L.P., Waverley Surgery Center, L.P., Bascom Surgery Center, L.P., Campus Surgery Center L.P., and El Camino Ambulatory Surgery Center, LLC to secure damages and injunctive relief, and demanding trial by jury, claim and allege as follows:

**I.**

**<u>JURISDICTION AND VENUE</u>**

1.      This FAC is filed and this action is instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against the named defendants' past, continuing, and on-going violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.      This Court has original and exclusive jurisdiction over the subject matter of this civil action under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337. This Court may exercise supplemental jurisdiction over the state law claims in the Second, Third, Fourth and Fifth Causes of Action pursuant to 28 U.S.C. § 1367. Each defendant maintains an office and transacts business on a systematic and continuous basis within this District, and may be found here, within the meaning of 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391. Further, the unlawful acts alleged herein were performed and occurred in material part within this District.

**II.**

**<u>THE PARTIES</u>**

3.      Plaintiff Bay Area Surgical Management, LLC (hereinafter "BASM") is a California limited liability company with a principal place of business located at 106 Heinz Ct., Los Gatos, California 95032. BASM manages some of the plaintiff ambulatory surgical centers ("ASCs") at which outpatient surgeries are performed. All of BASM's ASCs identified in paragraphs 4-9 below, are Medicare approved and/or certified by the American Association for Accreditation of Ambulatory

Blecher Collins
Pepperman & Joye

BC
PJ

Surgery Facilities.

4.     Plaintiff Bay Area Surgical Group, Inc. (hereinafter "BASG") is a California corporation with a principal place of business located at 2222 Lafayette Street, Suite 101, Santa Clara, California 95050.  BASG owns and operates an ASC at that address at which outpatient surgeries are performed.

5.     Plaintiff Forest Surgery Center, L.P. (hereinafter "Forest Surgery") is a California limited partnership with a principal place of business located at 2110 Forest Avenue, Suite 2, San Jose, California 95128.  Forest Surgery owns and operates an ASC at that address at which outpatient surgeries are performed.

6.     Plaintiff SOAR Surgery Center, LLC (hereinafter "SOAR") is a California limited liability company with a principal place of business located at 1849 Bayshore Highway, 3rd Floor, Burlingame, California 94010.  SOAR owns and operates an ASC at that address at which outpatient surgeries are performed.

7.     Plaintiff Knowles Surgery Center, LLC (hereinafter "Knowles Surgery") is a California limited liability company with a principal place of business located at 555 Knowles Drive, Suite 115, Los Gatos, California 95032.  Knowles Surgery owns and operates an ASC at that address at which outpatient surgeries are performed.

8.     Plaintiff National Ambulatory Surgery Center, LLC (hereinafter "National Ambulatory") is a California limited liability company with a principal place of business located at 15251 National Avenue, No. 207, Los Gatos, California 95032.  National Ambulatory owns and operates an ASC at that address at which outpatient surgeries are performed.

9.     Plaintiff Los Altos Surgery Center, L.P. (hereinafter "Los Altos Surgery") is a California limited partnership with a principal place of business located at 795 Altos Oaks Drive, Los Altos, California 94024.  Los Altos Surgery owns and operates an ASC at that address at which outpatient surgeries are performed.

Blecher Collins
Pepperman & Joye

BC
PJ

10. Aetna Life Insurance Company (hereinafter "Aetna") is a Connecticut corporation with its principal place of business at 151 Farmington Avenue, Hartford, Connecticut 06156 and is hereby named a defendant herein. Aetna conducts its business nationwide, including in the State of California.

11. United Healthcare Services, Inc. (hereinafter "United") is a Minnesota corporation with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota 55443 and is hereby named a defendant herein. United conducts its business nationwide, including in the State of California.

12. E3 Healthcare Management, LLC is a California limited liability company engaged in managing at least five in-network ASCs with its principal place of business at 14601 S. Bascom Ave., #100, Los Gatos, California 95032 and is hereby named a defendant herein.

13. Alpine Healthcare, LLC is a California limited liability company with its principal place of business at 375 Forest Ave., Palo Alto, California 94301 and is hereby named a defendant herein. Alpine manages in-network ASCs with E3.

14. Campus Surgery Center, L.P. is a California limited partnership with a principal place of business at 901 Campus Drive, #102, Daly City, California 94015 and is hereby named a defendant herein. Campus owns and operates an ASC at that address at which outpatient surgeries are performed.

15. Waverley Surgery Center, L.P. is a California limited partnership with a principal place of business at 400 Forest Avenue, Palo Alto, California 94301 and is hereby named a defendant herein. Waverly owns and operates an ASC at that address at which outpatient surgeries are performed.

16. Silicon Valley Surgery Center, L.P. is a California limited partnership with its principal place of business at 14601 S. Bascom Ave., #100, Los Gatos, California 95032 and is hereby named a defendant herein. Silicon Valley owns and operates an ASC at that address at which outpatient surgeries are performed.

Blecher Collins
Pepperman & Joye

BC
PJ

17.     Bascom Surgery Center, L.P. "Bascom") is a California limited partnership with its principal place of business at 3803 S. Bascom Ave., #106, Campbell, California 95008 and is hereby named a defendant herein.  Bascom owns and operates an ASC at that address at which outpatient surgeries are performed.

18.     El Camino Ambulatory Surgery Center, LLC is a California limited liability company with its with its principal place of business at 2480 Grant Road, Mountain View, California 94040 and is hereby named a defendant herein.  El Camino owns and operates an ASC at that address at which outpatient surgeries are performed.  The defendants identified in paragraphs 12 -18 are hereinafter collectively referred to as the "E3/Alpine" defendants.

### III.

### SUMMARY OF THE CASE

19.     This lawsuit is based on the on-going anticompetitive concerted action of plaintiffs' major ASC competitor (E3/Alpine), and the two health care insurance carrier defendants, to deny reasonable out-of-network payments to and/or reasonable compensatory contractual in-network arrangements with the named plaintiffs, so that E3/Alpine and the carriers can continue to control the ASC market and prices/reimbursement rates in Santa Clara/San Mateo Counties, California.

20.     Defendants who collectively exercise substantial power in the market for the use and provision ASC services in Santa Clara/San Mateo Counties in California conceived and implemented a multi-faceted coordinated anticompetitive scheme to exclude the BASM plaintiffs from the growing and lucrative ASC market.  Within the last few years, plaintiffs have contracted with an "all-star" cast of surgeons and quality ASCs which initially created a great surge in demand for access to its ASCs.

21.     Defendants E3/Alpine experiencing new and fierce competition from the BASM plaintiffs, carefully conceived a blueprint for the destruction of BASM. This multi-part anticompetitive scheme to eliminate BASM would only work,

however, if dominant insurance carriers actively participated. Through exerting its market power with Aetna/United, E3/Alpine threatened to terminate its in-network contracts with these large carriers and take its business out-of-network, thereby coercing and recruiting these carriers to execute its multi-phase plan to disrupt and cripple BASM's ASC business on *all* levels. The highly successful extinction campaign: (a) choked off reasonable reimbursement payments from Aetna and United to BASM for its ASC services; (b) intimidated and deterred surgeons from performing surgical procedures at BASM ASC facilities; and (c) scared away and financially disincentivised patients from utilizing BASM surgeons and BASM ASCs. This plot was undertaken by E3/Alpine to promote and further its own economic interests to the detriment of competition, surgeons, and patients in the relevant geographic market.

22. To thwart or marginalize plaintiffs' active and intense ASC competition, and to stifle the operation of freely functioning market forces, defendants have engaged in a concerted campaign that consists of at least the following anticompetitive and exclusionary acts: (a) inducing a group boycott of surgeons utilizing plaintiffs' ASCs through pressure tactics and threats; (b) inducing and persuading patients not to patronize plaintiffs' ASCs, (c) reducing the payments to plaintiffs' ASCs to non-compensatory levels, and/or denying payment altogether, for plaintiffs' out-of-network ASC services; and (d) refusing to offer reasonable, compensatory, and non-discriminatory insurance carrier in-network contracts to the BASM plaintiffs. Each time defendants have engaged in such conduct constitutes a new overt act in furtherance of the conspiracy, causing new and independent injury to the BASM plaintiffs.

23. As a consequence of this collusive and exclusionary conduct, competition in the ASC market in Santa Clara/San Mateo Counties in Northern California has been suppressed and consumers in that market have suffered a loss of choice and have been required to pay higher prices for services performed at

Blecher Collins
Pepperman & Joye

E3/Alpine's ASCs than would otherwise be the case in a competitive market.  In instances where BASM has not been compensated for ASC services by the carriers, and have been left no recourse but to balance bill insured patients, these patients have paid increased costs for services.  The competitive process, plaintiffs, and consumers have suffered antitrust injury by reason of this unlawful trade restraining conduct.

## IV.

## NATURE OF TRADE AND COMMERCE

24.     ASCs serve as vital providers of same-day outpatient surgical services, providing quality care for high demand medical procedures at lower cost in a more efficient setting.  Over the last 10 years, utilization of ASCs has increased by 70%.  An outpatient surgical procedure is a procedure that does not require an overnight hospital stay, where the patient stays at the facility for less than 24 hours.  ASCs treat only patients who have already seen a health care provider and selected surgery as the appropriate treatment for their condition.  ASCs typically provide surgical facilities for orthopedic, ophthalmic, dermatological, and gastrointestinal surgical procedures.

25.     More than 90% of ASCs are privately owned by physicians, often in partnership with management companies.

26.     Each of the named defendant insurance providers, Aetna and United, have specific health benefit plans through which their insureds are provided surgical and facility services covered by the plan which are reimbursable.  The plans also determine the extent to such insured bears financial responsibility, if any, for a portion of the charges through a copayment, coinsurance or deductible amount.  Insurance carriers act as both buyers and sellers in the market for health care

services.[1]

27.     The amount paid by a health benefit plan for covered services is further dependent upon whether the services were provided by in-network or out-of-network providers, *i.e.*, the surgeon and surgical facility.  In-network ASC providers accept a discounted rate in exchange for participation in the insured's network.  Insured patients who choose an in-network provider are assured that, for covered services, their responsibility for payment is limited to any applicable copayment, coinsurance and deductible amounts provided in their plan.  The insured patients' financial responsibility is reduced when the patient is served by an in-network provider in order to incentivize patients to stay in-network.  Insurance carriers also benefit from the in-network arrangements because they are only required to pay the pre-determined discounted rate to the provider.

28.     Out-of-network services, however, do not enjoy this advantage or assurance.  Different insurance benefit plans include different provisions for the rate at which out-of-network services will be reimbursed by the carrier.  In addition to any applicable copayment, coinsurance and deductible amounts, patient members are ultimately responsible for the difference between the amount billed by an out-of-network provider and the amount allowed by the plan for out-of-network services.  The amount allowed for out-of-network services is often referred to as the "allowed amount" or "recognized amount."

29.     Unlike in-network providers, out-of-network providers such as the BASM plaintiffs do not have the right, as ASC service providers, to seek payment for their services from the insurance carrier based on pre-negotiated fixed rates.  Instead, out-of-network providers submit bills for their services to the carrier on behalf of the insured (through an assignment of benefits), and the *carrier* then determines the amount it will pay based on the allowed or recognized amount in its

---

[1] *See Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).

policy with the insured. In order to effectively compete with defendant E3/Alpine's in-network arrangements, on occasion plaintiffs have sought to reduce the patients' disincentive to use their out-of-network ASC facilities by being flexible on the level of copayments made by patients, and/or not balance billing.

30. The American Medical Association publishes and licenses an annual compendium of CPT Codes, which has become the standard source for coding procedures for billing purposes in the health care industry. The CPT Code is, therefore, the standard means for describing the health care services rendered by providers when submitting claims for payment to health plans and the federal government.

31. Payment of benefits is made after a review of the services provided as represented on a reasonably standard claim form. A claim for benefits must include a description of the services provided to the insured. Providers describe the services by assigning a CPT Code and/or revenue code to each service rendered.

32. Defendants United and Aetna are goliaths in the highly concentrated health insurance industry in the relevant geographic market and wield and exercise control over the ASC market in– and out-of-network contracts and pricing/reimbursement for ASC facilities, physicians, and patients. Defendants Aetna and United's health benefit plans determine the extent to which a patient bears financial responsibility for a portion of the expense of an outpatient surgical procedure, which is typically limited to a copayment, coinsurance, or deductible amount when the patient uses in-network physicians and ASC facilities such as those controlled by defendant E3/Alpine. Likewise, in-network providers accept lower but pre-negotiated fixed reimbursement rates in exchange for participation in Aetna or United's network because patients will generally choose in-network providers in order to ensure their financial responsibility is limited.

33. Because out-of network providers, such as plaintiffs, cannot seek payment for their services based on pre-negotiated compensatory fixed rates, Aetna

1   and United have the unfettered prerogative and control to deny reasonable payment

2   or otherwise underpay out-of-network ASC facilities and physicians, or charge

3   patients for a higher portion of the surgical procedure for choosing a high quality,

4   out-of-network provider.

5       34.    The purpose and goal of the defendants' conspiracy has been to

6   suppress, cripple, and eliminate the BASM plaintiffs as viable ASC competitors.

7   This has been achieved through E3/Alpine's successful efforts in inducing and

8   persuading Aetna and United to underpay, or refuse to pay, the BASM plaintiffs for

9   their out-of-network services and to agree not to enter into compensatory in-network

10  contracts with BASM that would allow a level playing field and the ability for

11  plaintiffs to compete with E3/Alpine and grow their revenues/profits. The pressure

12  and coercion exerted by E3/Alpine over Aetna and United, among other things, was

13  to continually threaten to cancel/terminate its own in-network contracts with these

14  carriers unless these carriers agreed to implement and undertake coordinated actions

15  to discipline, reduce, and eliminate the BASM plaintiffs as meaningful or significant

16  ASC competitors in the relevant market.

17                              **V.**

18                   **INTERSTATE COMMERCE**

19      35.    The actions complained of herein will continue to restrain and

20  adversely affect interstate commerce in that the defendant insurance carriers sell

21  their health insurance policies and services across state lines. The E3/Alpine

22  defendants and each plaintiff purchase goods and supplies in interstate commerce.

23                              **VI.**

24                   **CLAIMS FOR RELIEF**

25                   **FIRST CAUSE OF ACTION**

26        **(Violation of Section One of the Sherman Act)**

27                    **(15 U.S.C. § 1)**

28      36.    Plaintiffs hereby allege and incorporate by reference each allegation set

forth in Paragraphs 1 through 35 of this FAC, as if set forth in full herein.

37.    The antitrust laws are concerned with protecting the economic freedom of participants in the relevant market.  The aims and objectives of the antitrust laws are aimed at encouraging innovation, industry, and competition.  The central purpose of the antitrust laws is to preserve competition and it is that interaction of competitive forces that benefits consumers.[2]

38.    Section 1 of the Sherman Act prohibits, *inter alia*, agreements or arrangements that unreasonably restrain competition in interstate commerce.  (15 U.S.C. § 1.)[3]  Antitrust law does not require identical motives among conspirators when their independent reasons for joining together lead to a collusive action with a common purpose.[4]  A combination or conspiracy can be shown through circumstantial or direct evidence.[5]

39.    No formal agreement is necessary to constitute an unlawful conspiracy under the Sherman Act.[6]

40.    A group boycott or concerted refusal to deal is a *per se* of the antitrust laws.[7]  Group boycotts or concerted refusals to deal are *per se* offenses that do not require a showing of market power.[8]  Further, because plaintiffs have also alleged

[2] *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).

[3] *See Columbia River People's Util. Dist. v. Portland General Electric Co.* 217 F.3d 1187, 1190 (9th Cir. 2000); *American Ad Mgmt., Inc. v. GTE Corp.* 92 F.3d 781, 788 (9th Cir. 1996).

[4] *See United States v. Apple, Inc.*, 791 F.3d 290, 317 (2d Cir. 2015).

[5] *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990).

[6] *See American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946); *De Jong Packing Co. v. U.S. Dep't of Agriculture*, 618 F.2d 1329, 1334 (9th Cir. 1980).

[7] *See United States v. General Motors Corp.*, 384 U.S. 127, 145 (1966); *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 467-86 (1941).

[8] *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 432-36 (1990); *National Collegiate Athletic Ass'n. v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109-10 (1984); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959); *United States v. General Motors Corp.* 384 U.S. 127 (1966); *Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988); *Oltz v. St. Peter's*

FIRST AMENDED CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Blecher Collins
Pepperman & Joye

Blecher Collins
Pepperman & Joye

BC
PJ

1  actual and demonstrable effects on the competitive process flowing from

2  defendants' conspiratorial conduct, proof of market power is not required.[9]  By

3  reason of the boycott carried out by dominant players in the healthcare insurance

4  industry, Aetna and United, the BASM plaintiffs have lost capital, surgeons, and

5  patients -- all necessary and essential components to survive as an ASC competitor.

6                              **Relevant Product Market**

7         41.    The relevant product market for antitrust purposes in this case is

8  defined as the provision of surgical services through ambulatory surgical centers.

9  ASCs, which provide only outpatient same-day procedures, do not effectively or

10 meaningfully compete with regular hospitals which in most cases provide longer

11 term care and stays for surgical patients whereas ASCs are not permitted to have

12 patients overnight at their facilities.  Moreover, ASCs generally do not provide

13 emergency services.  Additionally, ASCs generally have both lower prices and costs

14 than hospitals.  ASCs distinguish themselves from traditional hospitals because

15 ASCs typically: (a) provide shorter stays for patients; (b) have lower rates of

16 infection; (c) higher emphasis on patient care and comfort; (d) provide innovative

17 medical technology and facilities; (e) have highly trained, specialized medical staff;

18 and (f) provide convenient surgical center locations and predictable schedules.

19 Hospitals and ASCs provide care to two entirely distinct sets of patients.

20 Consequently, because traditional hospitals and ASCs are markedly different for the

21 patient in terms of cost, length of stay, efficiency, quality, and range of surgical

22

23

24 ─────────────────────
   *Community Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988) ("Group boycotts,
25 sometimes called concerted refusals to deal, commonly are considered business
   practices that merit per se invalidation under section 1."); *Lie v. St. Joseph Hosp. of*
26 *Mount Clemens, Mich.*, 964 F.2d 567, 569 (6th Cir. 1992).

27 [9] *See, e.g. FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Oltz v. St.
   Peter's Comm. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988); *KMB Warehouse*
28 *Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 124-28 (2d Cir. 1995)

Blecher Collins
Pepperman & Joye

BC PJ

1  services, they are not reasonably interchangeable or substitutes for each other.[10]

2      42.    The definition of relevant market is a fact-intensive inquiry.[11]

3  <center>**Relevant Geographic Market**</center>

4      43.    The relevant geographic market for antitrust purposes in this case is no

5  broader than the Counties of Santa Clara and San Mateo in Northern California.

6  The relevant geographic market is the area of effective competition in which the

7  parties operate and to which customers can practically turn for the desired services.

8  The geographic market for ASCs is local in scope. All of the plaintiff and defendant

9  ASCs herein are located and conduct business in this area. Medical care markets are

10  limited to the range in which a patient will travel for medical care and the range in

11  which a physician will travel to a facility to perform such services. Because only

12  outpatient, same-day procedures can be performed at ASCs, patients and physicians

13  will not travel significant distances to a particular ASC facility for a procedure.

14  ASCs located outside of this geographic area are not reasonable substitutes for

15  ASCs locate within this area. Accordingly, the area comprising no larger than Santa

16  Clara and San Mateo Counties in Northern California is a properly defined

17  geographic relevant market in this case.[12]

18  <center>**Antitrust Standing**</center>

19      44.    Plaintiffs have the requisite standing to assert antitrust claims against

20  _____

21  [10] *See Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F. Supp. 2d 389, 418-20 (N.D.N.Y 2004) (ambulatory surgery was relevant product market).

22  [11] *See Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th

23  Cir. 2008); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008).

24  [12] *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Markets for

25  dental services tend to be relatively localized."); *U.S. v. Rockford Memorial Corp.*, 898 F.2d 1278, 1284-85 (7th Cir. 1990) (affirming district court's ruling that relevant market is City of Rockford and its surrounding area); *Saint Alphonsus Med.*

26  *Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015)

27  (examining willingness to travel as factor for geographic market for primary care physicians); *Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279,

28  1290 (D. Del. 1995 (single county relevant market).

these defendants because they are participants and competitors in the relevant market and have suffered injury by reason of the restraints and concerted exclusionary conduct of the defendants.[13]

**Combination and Conspiracy to Restrain Competition**

45.     The anticompetitive scheme and plan of the defendants to unreasonably restrain trade in the above-described trade and commerce has been done with the intent to specifically eliminate the BASM plaintiffs as viable ASC competitors and as a threat to E3/Alpine's business operations, and to reduce competition in general.[14]  Beginning in March 2010, and continuing thereafter through the present, E3/Alpine, Aetna and United, collectively engaged in a continuous stream of communications about the BASM plaintiffs with the objective of eliminating, restraining or substantially reducing plaintiffs' ability to compete in the ASC market in Santa Clara/San Mateo Counties.  Defendants' concerted action has been continuous and on-going through the present and each new and independent overt act has caused new injury to the BASM plaintiffs.  There have been numerous writings, conversations and meetings among these three entities to accomplish the unlawful objective of restraining and eliminating competition.

46.     The genesis of the coordinated conspiracy began at the latest on March 18, 2010 when at a California Ambulatory Surgery Association ("CASA") trade association meeting in California, Dr. Jay Pruzansky (Managing Member of defendant Alpine Healthcare and Director of defendant E3 Healthcare LLC) approached a Manager at Aetna, Mark Reynolds, to discuss the purported

---

[13] *See American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051, 1057-58 (9th Cir. 1999).

[14] *See Kissing Camels Surgery Center, LLC v. Centura Health Corp.* Civ. No. 12-cv-2012-WJM-NYW, 2015 WL 5081608, *4 (D. Colo. August 28, 2015) (Court denied summary judgment on antitrust conspiracy claim on which plaintiff ASCs claimed co-conspirators, including Aetna and United, as part of agreement "under which insurers would take action against Plaintiffs for what they perceived as unlawful billing practices.")

FIRST AMENDED CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

"unlawful" fee gouging business activities of the BASM plaintiffs. Dr. Pruzansky was an attendee and speaker at that CASA meeting and expressed the view that out-of-network ASCs were "charging exorbitant surgical fees to the payors," such as Aetna. Dr. Pruzansky provided Mr. Reynolds with BASM marketing and financial materials that he had intercepted which BASM had provided to prospective surgeon investors. Dr. Pruzansky convinced Aetna to investigate and "assist in stopping this type of aberrant surgery center behavior" from competing ASCs. That same day, Mr. Reynolds reported back to Aetna about his meeting with Dr. Pruzansky, stating: "How can we bring down the hammer on these guys?"

47.     Dr. Pruzansky then contacted Mary Hull (Aetna Provider Team Leader -- Special Investigations Unit) on March 24, 2010 to enlist Aetna's participation to file a formal complaint with the California Medical Board challenging BASM's level of fees billed for ASC services. Dr. Pruzansky vowed to continue to gather information concerning BASM. The Aetna representative asked Dr. Pruzansky to provide "contact information" for the United representative. The United attorney was Carolyn Ham (Associate General Counsel).

48.     In April 2010, Ms. Hull (Aetna) advised Dr. Pruzansky that a group of Aetna management and investigators had conducted some research on information originally brought to Aetna's "attention" by Dr. Pruzansky, and wanted to write a letter to the California State Attorney General and the Office of the Inspector General concerning BASM. In July 2010, Dr. Pruzansky confirmed to Ms. Hull (Aetna) that a letter was sent out by the City of Los Gatos "to the appropriate state agencies."

49.     As a direct result of Dr. Pruzansky's encouragement and prodding, on May 20, 2010, Aetna issued a request to the Office of the Inspector General of the Department of Health and Human Services, the Attorney General of California, and the California Department of Public Health that they "commence an investigation" into BASM's "contemplated" financial/marketing practices. However, no action

Blecher Collins Pepperman & Joye

Blecher Collins
Pepperman & Joye

BC
PJ

1    has ever been initiated or taken by any of these agencies or entities against any of

2    the BASM plaintiffs as a result of the requested investigations.

3         50.    In February 2011, Dr. Pruzansky wrote to Mr. Reynolds (Aetna)

4    threatening: "I am writing as I am frustrated and seriously considering canceling my

5    Aetna contracts at our 4 out-patient surgery centers (ASC's)."  This threat to

6    withdraw came as a result of BASM's then-recent acquisition of an ASC in the

7    relevant geographic market and the opening of new additional ASCs.  Dr. Pruzansky

8    viewed this development as an escalated, competitive threat to E3/Alpine because it

9    had already lost substantial surgery "case volume" to BASM which had reduced its

10   revenues and profits.  To combat this expansion and competition, Dr. Pruzansky

11   enlisted the assistance of Aetna and demanded that it "can and should do" at least

12   the following: (a) encourage the Aetna sales force to change benefit plan designs by

13   adding out-of-network caps on out-patient surgery benefits, or limit payments to a

14   percent of the Medicare fee schedule; (b) audit BASM's ASCs to review the

15   payments being made for "all" surgical procedures; (c) terminate any Aetna in-

16   network contracted physician who brings a case to an out-of-network facility that

17   can be performed at an Aetna contracted ASC; (d) audit patients, who use out-of-

18   network ASCs, for collection of co-payments, deductibles, and payments issued

19   directly to patients; (e) Aetna should develop its own database from its own internal

20   Explanations of Benefits to be used "to justify not paying those [out-of-network

21   ASC] facilities;" (f) engage in discussions with local companies and public and

22   government regulators exposing the purported unfair competition from BASM and

23   its "unscrupulous surgery center managers;" and (g) report BASM's billing practices

24   to the California Attorney General and/or the Medial Board of California.  Dr.

25   Pruzansky signed off by stating that "any additional . . . assistance" by Aetna

26   "would be appreciated."  This lengthy and detailed memo would become the

27   blueprint for the closely coordinated and orchestrated plan to drive BASM out of the

28   market.

Blecher Collins
Pepperman & Joye

51.   On March 3, 2011, Dr. Pruzansky wrote to another E3/Alpine Director: "I feel like we are competing with one hand tied behind our back." He signed off the email with: "pissed-off Pruzansky."

52.   Mr. Reynolds (Aetna) thanked Dr. Pruzansky "for the very detailed information" and requested an in-person meeting. They both again met at another CASA trade association meeting held in Dana Point, California. Dr. Pruzansky followed-up the meeting with an email to Mr. Reynolds on April 4, 2011 advising that BASM had announced that it was opening another "non-par facility" in the Los Gatos-San Jose area. In a thinly veiled threat, Dr. Pruzansky stated: "It continues to be a challenge to stay in-network and do the right thing."

53.   In furtherance of the concerted plot, in April 2011, E3/Alpine and Aetna *jointly* retained Christine Hall, an attorney, to participate in the investigation and "drafting of a complaint ultimately filed by Aetna with the Medical Board of California . . . concerning BASM's conduct." Ms. Hall reported to Dr. Jay Pruzansky/Dr. Steven Kanter (Directors of E3/Alpine) and Laura Jackson (Aetna In-House Counsel) and believed she provided "equal benefit for both parties."

54.   The cohesive group began the process of drafting a "white paper" as a collaborative effort which would become the roadmap for the Medical Board Complaint against BASM. Sometime in mid-to-late 2011, defendant United was tapped to join ranks with E3/Alpine and Aetna in their collusive scheme to eradicate BASM. Bryan Westerfeld, an outside attorney for United, participated in the numerous discussions and communications relating to the various iterations of the team's "white paper." On October 8, 2011, Tyler Draa, E3/Alpine's outside attorney, in a transmission email for the "white paper" wrote to Mr. Westerfeld (United), Ms. Jackson (Aetna), Ms. Hall (Aetna and E3/Alpine), and Dr. Pruzansky: "Attached please find a very rough draft of a collection of legal musings I put together regarding the legal landscape in which BASM is operating. Christine Hall is turning this into a much more detailed, thoughtful, and comprehensive treatise."

In an October 10, 2011 version of the "white paper," E3/Alpine's counsel cries foul that "BASM and its affiliated ASCs are attracting surgeons (and the surgeons' patients) to utilize surgery centers that are, by design, "'out-of-network.'" This alone provides the motive for the defendants' collective and focused anticompetitive attack on BASM.

55.     Between September and December 2011, high level management and legal representatives for E3/Alpine, Aetna, and/or United participated in at least 67 written communications, and numerous conferences, concerning the: (1) "white paper" treatise on BASM; (2) Medical Board Complaint; and (3) a BASM offering memorandum. On November 1, 2011, with the input, backing, and support of co-conspirators E3/Alpine and United, Aetna filed a formal written Complaint with the California Medical Board.[15] However, the Medical Board did not issue any rulings or take any disciplinary action against BASM.

56.     Not satisfied with receiving no response or relief from the Medical Board, both Aetna and United proceeded in tandem to file substantially similar civil Complaints against BASM and its management in Superior Court in Santa Clara County. Aetna filed its Complaint on February 2, 2012, followed by the filing of United's Complaint shortly thereafter on June 18, 2012.[16] The absurdity of these Complaints is summed up, and highlighted by, the core allegation that because these insurance carriers are busy processing millions of claims, they do not have time to review all out-of-network claims for ASC services for accuracy and reasonableness and have therefore on occasions made payments to BASM which in hindsight (according to the carriers' biased view of the world) should have been reimbursed at lesser amounts. Rather than fraud, these scenarios should instead be characterized

---

[15] BASM is <u>not</u> predicating any of its liability claims herein on the filing of the Medial Board Complaint or any of the letters written to any governmental agency or entity.

[16] BASM is <u>not</u> basing any of its liability claims herein on the filing or maintenance of either of these lawsuits.

Blecher Collins
Pepperman & Joye

Blecher Collins
Pepperman & Joye

BC
PJ

1   as laziness or negligence on the part of these carriers.  The true purpose of these

2   lawsuits is made clear in an e-mail from Karen Jansen (E3/Alpine) to Andrea Tyler

3   (Aetna Network Manager): "[H]ow do you feel about BASM's take on this whole

4   lawsuit stating this is Aetna's way of strong-arming them to take a below market

5   contract?"  After the filing of the Aetna lawsuit, Lawrence Aufmuth (Director

6   E3/Alpine) wrote: "Our ASCs are contracted with Aetna at all of our facilities and

7   we completely endorse what Aetna is doing on all fronts."

8         57.     Throughout 2012 and continuing to the present, in furtherance of

9   E3/Alpine's directive and multi-step lethal plan to marginalize or eliminate

10  competition from BASM, United and Aetna aggressively proceeded to boycott,

11  intimidate, and harass BASM, its active and potential surgeons, and their actual and

12  prospective patients.  Each of these separate acts directed at actual and potential

13  BASM surgeons and patients constitutes a new and independent anticompetitive act.

14  For example, from at least July 2011 through the present, Aetna's Director of

15  Network Management sent written warnings to one or more BASM affiliated

16  surgeons stating Aetna was "concerned" about the practice of referring patients to

17  BASM's "nonparticipating" ASC facilities.  Aetna threatened that "continued use of

18  nonparticipating facilities" would result in "your profile on DocFind® will inform

19  our [patient] members about the additional costs associated with using out-of-

20  network providers."

21        58.     Additionally, from at least April 2012 through the present, United sent

22  letters to BASM surgeons accusing them of breaching their Preferred Provider

23  Agreements by referring United patient members to one of BASM's out-of-network

24  ASC facilities.  These physicians were also threatened with "termination" of their

25  carrier agreements if they did not "cease any further referrals."

26        59.     To stigmatize and punish BASM affiliated surgeons that have in-

27  network contracts with United, it posted the following warning "designations" on

28  the United website which is accessed by its patient insureds to find in-network

surgeons: "The care provider has not met guidelines for providing quality care. For quality, care providers must meet national industry standards of care. If care providers do not meet the quality criteria, they are not eligible for the cost-efficiency designation." As of 2015, these warnings remain on United's website.

60.     Defendant United has also posted the following "designation" for BASM affiliated surgeons: "The care provider has met guidelines for providing quality care. For quality, care providers must meet national industry standards of care. The care provider has not met guidelines for cost-efficiency care. For cost-efficiency, care providers must meet cost-efficient use of resources in delivering care." As of 2015, these designations remain on United's website.

61.     The intent and purpose of these United negative "designations" of BASM surgeons was to make them less attractive to prospective insured patients of these surgeons and reduce their business.

62.     Further, investigators from Aetna sent written questionnaires to patients, to complete and return, that had submitted claims for services performed by their surgeons at an ASC facility owned or controlled by BASM. These multi-part patient questionnaires demanded information, among other inquiries, concerning billing and payment practices, disclosures of the surgeons relating to financial ownership in an ASC, the level of care provided, whether they had seen negative press articles about BASM, and requested a telephone interview. These investigative demands were intended to poison patients' minds and intimidate and deter them from using BASM's ASCs.

63.     United contracted with Viant, a patient advocacy service, to contact patients using BASM's out-of-network ASC services to advise them as to the amount United had determined would be the "allowable amount" of reimbursement. In all cases the amount was lower than the amount billed by BASM. These written notifications threatened that the specific plaintiff-owned ASC did "not reduce its bill, you may be liable for the amount that exceeds the allowable amount under your

health plan." These threat letters were sent to BASM surgical patient beginning in at least 2012, and continuing to the present.

64. As intended by the co-conspirator defendants, their coordinated action plan has had disastrous effects on the BASM plaintiffs' revenues, profits, growth and number of surgical procedures performed at BASM ASCs. From their peak in 2010 and 2011 through 2014, BASM's ASC revenues have dropped in excess of $46.2 million. This figure represents a 45% decline in BASM's business over this period. The number of surgical procedures at the BASM plaintiffs' ASC facilities which peaked in 2011-2012 have now on average dropped over 20% by the end of 2014.

65. Between 2010 and the present, for at least 154 surgical cases, defendant United has refused to pay any amount to BASM representing over $3 million in lost billings to BASM. Similarly, defendant Aetna has paid zero on 124 surgical cases amounting to over $3 million in losses to BASM. Each time Aetna and/or United has refused to pay BASM for ASC services constitutes a new and independent overt anticompetitive act.

66. Acting in concert through blatant acts of boycott, coercion, and intimidation at the urging of E3/Alpine, Aetna and United have intentionally ruined BASM's ability to effectively compete as an out-of-network ASC provider and will not do business with BASM unless it accepts low below-market in-network rates and/or agreeing to other oppressive in-network contract terms.

67. If defendants Aetna and United were independently acting in their own economic self-interests, and without colluding through succumbing to pressure and coercion from E3/Alpine, each would have provided BASM with compensatory and non-discriminatory in-network contracts. The antitrust laws impose joint and several liability upon each participant in a conspiracy.[17]

_____

[17] *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981).

Blecher Collins
Pepperman & Joye

BC
PJ

68. In sum, these agreements, combinations and concerted action constitute unreasonable restraints of trade violative of Section 1 of the Sherman Act. The overall anticompetitive scheme consists of at least the following acts/conduct to be viewed as a whole:

(a) E3/Alpine has induced, pressured and convinced the insurance carrier defendants to limit, control and restrain the business activities of the BASM plaintiffs, its singular main ASC competitor;

(b) successfully threatening, intimidating and coercing actual and potential surgeons not to deal with the BASM plaintiffs through denial, or underpayment, of fees and cancellation of their in-network contracts for referring patients to plaintiffs ASCs;

(c) inducing, organizing and implementing a group boycott of or concerted refusal to deal among surgeons not to deal with plaintiffs;

(d) inducing, organizing and implementing a group boycott among plaintiffs' actual and prospective patients not to patronize plaintiffs' ASCs;

(e) defendant carriers refusing to enter into a reasonable, compensatory, and non-discriminatory in-network ASC facilities fee contracts with plaintiffs that would assure their ability to compete with E3/Alpine on a level playing field; and

(f) defendants Aetna and United consistently refusing to pay, or underpaying, the BASM plaintiffs' out-of-network claims submitted by plaintiffs to the carrier defendants for ASC facility fees in order to dry up BASM's revenue flow to cause BASM to exit the market.

**Actual Substantial Anticompetitive Effects and Antitrust Injury to Plaintiffs, Competition, and Consumers**

69. Defendants' joint and concerted predatory and exclusionary conduct has caused antitrust injury to plaintiffs, competition and consumers.

70. As a direct result of the foregoing anticompetitive conduct and

restrictions on competition, ambulatory surgical centers, and surgeons have been restricted from functioning in a competitive and open market, output has been limited and the quality and freedom of choice of ASC facilities and surgeons among patients has been reduced and diminished in this concentrated market.[18]  Because of the combinations and conspiracy, the ability of plaintiffs to attract surgeries has been severely impacted and the number of surgeries performed at plaintiffs' ASCs has diminished significantly.  Moreover, patients have been required to pay coinsurance so that costs to consumers have increased.  There are no business, technological or efficiency reasons or justifications that require defendants to impose these anticompetitive conditions and restrictions.

71.    The carrier defendants' failure to appropriately and fairly compensate non-contracted ASC claims has not only injured BASM, it has also caused BASM's ASC patients (defendants' Aetna and United's insureds) to be exposed to significant liability by reason of not paying, or underpaying, BASM's claims.  Indeed, the carriers represent to patients, in written Explanation of Benefits, that the patients are *liable* to BASM ASCs for amounts that should have been covered and paid to BASM by these carriers.

72.    Defendants' restrictions, threats and arrangements have created a barrier that precludes effective entry by other competitors into the relevant market and the quality and variety of ASC offerings in that market have been reduced and constrained.

73.    The aforesaid collusive conduct of defendants has produced antitrust injury, and unless enjoined by this Court, will continue to produce at least the

---

[18] *See Kissing Camel Surgery Center, LLC v. Centura Health Corp.,* Civ. No. 12-CV-392-WJM-NYW, 2015 WL 5081608, *7, (D. Colo. August 28, 2015) (elimination of any of the ASC plaintiffs as competitors in a concentrated market could constitute harm to "competition as a whole" for antitrust injury purposes.): *Glen Holly Entertainment Inc. v. Textronix Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (antitrust injury where "[c]oercive activity . . . prevents its victims from making free choices between market alternatives.")

Blecher Collins
Pepperman & Joye

following actual and demonstrative anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

(a)     competition in the provision of surgical services in Santa Clara/San Mateo Counties has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b)     barriers to entry into the relevant market have been raised which has prevented or delayed the entry of new ASC competitors;

(c)     consumer choice has been, and will continue to be, significantly reduced, limited and constrained as to selection, price and quality of ambulatory surgical services in Santa Clara/San Mateo Counties; and

(d)     consumer access to plaintiffs' competitive ASCs has been artificially restricted and reduced and its service offerings will continue to be excluded from the market.

74.     Antitrust injury is a fact question for the jury.[19]

**Affect on Interstate Commerce**

75.     Defendants' concerted restrictions and arrangements affect a substantial volume of interstate commerce in the relevant market.

**Rule of Reason**

76.     In the alternative, defendants' concerted conduct and arrangements are unlawful under the antitrust laws when assessed under the "Rule of Reason." Restraints on competition are generally deemed "unreasonable" if they raise price, reduce output, lower quality, eliminate customer choice, or create or enhance power in the relevant market.[20]  The anticompetitive consequences of defendants' concerted conduct as described herein outweigh any procompetitive effects thereof.

---

[19] *See Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1295-96 (9th Cir. 1984).
[20] *See California, ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011).

5:15-cv-01416-BLF-NC
FIRST AMENDED CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Blecher Collins
Pepperman & Joye

Blecher Collins
Pepperman & Joye

BC
PJ

**Market Power**

77.     In the event a Rule of Reason analysis applies to plaintiffs' antitrust claims herein, a showing of some level of market power may be necessary.  Market power is generally defined as the power to control prices or exclude competition in the relevant market.[21]  A defendant, however, need not actually raise prices to be found to have the power to do so.[22]  The threshold for market power under Section 1 of the Sherman Act is lower than for monopoly power under Section 2.[23]  Market power determination is a fact-intensive issue reserved for the fact-finder.[24]

78.     The market power among the defendants may be aggregated because they have combined and conspired together to restrain competition and induce a group boycott of BASM's ASC facilities.[25]  The health insurance industry in Santa Clara/San Mateo Counties in Northern California is a highly concentrated oligopoly consisting primarily of United, Aetna, Cigna, Blue Shield, and Blue Cross.  In such a concentrated market, market power can be shown even if the defendants do not possess a dominant share of the market.[26]

79.     Aetna and United, as dominant players in the market, have the power to

---

[21] *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997); *ALW, Inc. v. United Airlines, Inc.*, 510 F.2d 52, 55 (9th Cir. 1975).

[22] *See American Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946); *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451, 490 (1992).

[23] *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992); *Dyno Nobel, Inc. v. Amotech Corp.*, 63 F. Supp. 2d 140, 150 (D.P.R. 1999).

[24] *See e.g., Rebel Oil Co. v. Atlantic Richfield Co.* 51 F.3d 1421, 1438 (9th Cir. 1995); *Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.* 912 F.2d 563, 569 (2d Cir. 1990); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal. 2010) (no requirement to plead market power with specificity).

[25] *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1437-38 (9th Cir. 1995); *United States v. American Airlines, Inc.*, 743 F.2d 1114, 1119-20, 1122 (5th Cir. 1984).

[26] *See e.g. United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003); *United States v. American Express Co.*, No. 10-cv-4496 (NGG) (RER), 2015 WL 728563 (E.D.N.Y. Feb. 19, 2015).

FIRST AMENDED CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

control prices, rates and reimbursements for surgical procedures, as well as control which physicians and ASCs may have in-network contracts and the terms and rates of those contracts. Aetna and United also wield the power to deter and prohibit surgeons and patients from utilizing the BASM plaintiffs' ASC facilities and services.

80.     Defendant E3/Alpine possesses significant market power and collectively constitute the largest ASC competition to the BASM plaintiffs in the relevant market. E3/Alpine has the power to control rates and destroy competition. The favorable in-network contracts that E3/Alpine has with Aetna, United and other insurance carriers strengthen and facilitate its ability to exert market power, suppress competition and stabilize or reduce reimbursement rates paid to competitors. E3/Alpine successfully exercised its market power by threatening to terminate its in-network contracts with Aetna and United if these carriers did not agree to undertake the anticompetitive conduct alleged herein against the BASM plaintiffs.

**Damage to Plaintiffs**

81.     By reason of, as a direct and proximate result of defendants' continuing practices and conduct, plaintiffs have suffered, and will continue to suffer, financial injury to their business and property. Defendants' coordinated and focused anticompetitive conduct has cumulatively, incrementally, and unreasonably restricted competition and devastated BASM's business. As a result, plaintiffs have been deprived of revenues and profits they would have otherwise made, suffered diminished market growth and sustained a loss of goodwill and gong concern value. Defendants' conduct has decreased plaintiffs' ASC business volume and substantially diminished their business value. Plaintiffs have not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when they do so, they will seek leave of the Court to insert the amount of the damages sustained herein.

Blecher Collins
Pepperman & Joye

## <u>SECOND CAUSE OF ACTION</u>

### (Intentional Interference with Prospective Economic Advantage)

82.     Plaintiffs hereby allege and incorporate by reference each allegation set forth in Paragraphs 1 through 81 of this FAC, as if set forth in full herein.

83.     This Court has jurisdiction over this Second Cause of Action based on the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because this Second Cause of Action arises from the same transactions and from a common nucleus of operative facts as alleged in the first federal based cause of action.

84.     Each named plaintiff has existing and valuable business relationships, as well as reasonable expectations of further and future relationships, with surgeons and their actual and prospective surgical patients.

85.     Defendants were each aware of these prospective business contractual relationships and engaged in intentional and wrongful conduct designed or calculated to disrupt and interfere with those relationships.  Defendants knew these disruptions or interferences were substantially certain to occur as a result of their conduct.

86.     Defendants' wrongful conduct in interfering with such prospective business contractual relations is intentional, malicious and without justification and such conduct and overall scheme was undertaken solely to hinder, if not eliminate, competition.  Defendants' anticompetitive conduct was not privileged or excused and was without any legitimate business justification.  Defendants have knowingly engaged in such wrongful conduct for the purpose of excluding competition and to deprive consumers of the benefits of free and open competition.  In doing so, defendants have wrongfully interfered with the on-going and future expected relationships of one or more plaintiffs and the following physicians, among others: Dr. Andy Yu, Dr. Peter Yuon, Dr. Julia Kahan, Dr. Norman Kahan, Dr. Samir

Sharma, Dr. Jeff Gutman, and Dr. Shahram Gholami.[27]  Each of these surgeons was at one time an investor and/or shareholder in one or more of BASM's ASCs. Defendants' conduct has caused, at least the physicians/groups identified above, and their patients, to significantly reduce the business they conduct with plaintiffs and/or terminate the previous relationships altogether. Defendants' joint acts to interfere have also deterred and precluded other physicians from utilizing the BASM plaintiffs ASC facilities or becoming physician shareholders owners.  The alleged tortious conduct of the defendants is continuing through the present and took place during the two years preceding the filing of the BASM plaintiffs' original Complaint herein.

87.     By means of the alleged actions, including but not limited to the unfair, anticompetitive and/or predatory acts set herein, defendants intended to pressure and induce plaintiffs' physicians and their patients to end or disrupt their prospective economic relationships with plaintiffs.  Defendants' conduct was a substantial factor in causing financial injury to each plaintiff and has rendered it more difficult for each plaintiff to remain and survive as a viable competitor

88.     Plaintiffs' business and goodwill has been, and will continue to be, substantially injured by defendants' wrongful and unjustified conduct.  Additionally, prospective customers of each plaintiff will continue to be injured and harmed by defendants' acts and practices.  Although each plaintiff has incurred substantial losses as a proximate result of the foregoing acts, and will continue to incur substantial losses in the future as well as its growth being negatively impacted, all such losses may be difficult to calculate with precision.  Therefore, in addition to any recoverable damages proximately caused by the alleged wrongful conduct, each plaintiff will also seek a permanent injunction preventing defendants from continued wrongful interference in the future.

---

[27] *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003).

Blecher Collins
Pepperman & Joye

BC
PJ

89. The intentional and disruptive conduct of each defendant was willful, malicious and oppressive. Consequently, an award of exemplary or punitive damages in an amount sufficient to punish and deter such conduct is justified.

## THIRD CAUSE OF ACTION

### (Intentional Interference with Actual Contractual Relations)

90. Plaintiffs hereby allege and incorporate by reference each allegation set forth in Paragraphs 1 through 89 of this FAC, as if set forth in full herein.

91. This Court has jurisdiction over this Third Cause of Action based on the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because this Third Cause of Action arises from the same transactions and from a common nucleus of operative facts as alleged in the first federal based cause of action.

92. Each named plaintiff has existing and valuable contracts with surgeons and their actual and prospective surgical patients.

93. Defendants were each aware of these contractual relationships, as well as the identity of plaintiffs' surgeons and their patients, and engaged in intentional and wrongful conduct designed or calculated to disrupt the performance of those contracts.

94. Defendants' wrongful conduct in interfering with such contractual relations is intentional, malicious and without justification and such conduct and overall scheme was undertaken solely to hinder, if not eliminate, competition. Defendants' anticompetitive conduct was not privileged or excused and was without any legitimate business justification. Defendants have knowingly engaged in such wrongful conduct for the purpose of excluding competition and to deprive consumers of the benefits of free and open competition. In doing so, defendants have wrongfully interfered with the past and existing relationships of one or more plaintiffs and the following physicians, among others: Dr. Andy Yu, Dr. Peter Yuon, Dr. Julia Kahan, Dr. Norman Kahan, Dr. Samir Sharma, Dr. Jeff Gutman, and Dr.

Blecher Collins
Pepperman & Joye

Shahram Gholami.[28]  Each of these surgeons was at one time an investor and/or shareholder in one or more of BASM's ASCs.  Defendants' conduct has caused at least the physicians/groups identified above, and their patients, to significantly reduce the business they conduct with plaintiffs and/or terminate the previous relationships altogether.  The alleged tortious conduct of the defendants is continuing through the present and took place during the two years preceding the filing of the BASM plaintiffs' original Complaint herein.

95.     By means of the alleged actions, including but not limited to the unfair, anticompetitive and/or predatory acts set herein, defendants intended to and did in fact, pressure, induce and cause plaintiffs' physicians and patients to breach, end or restrict their contractual relationships with plaintiffs.  As a result, defendants' conduct has prevented the performance, maintenance or completion of plaintiffs' existing and valuable contracts, or has made performance more difficult.

96.     Defendants' conduct was a substantial factor in causing financial injury to each plaintiff.  Plaintiffs' business and goodwill has been, and will continue to be, substantially injured by defendants' wrongful and unjustified conduct.  Additionally, actual and prospective customers of each plaintiff will continue to be injured and harmed by defendants' acts and practices.  Although each plaintiff has incurred substantial losses as a proximate result of the foregoing acts, and will continue to incur substantial losses in the future as well as its growth being negatively impacted, all such losses may be difficult to calculate with precision.  Therefore, in addition to any recoverable damages proximately caused by the alleged wrongful conduct, each plaintiff will also seek a permanent injunction preventing defendants from continued interference in the future.

97.     The intentional and disruptive conduct of each defendant was willful, malicious and oppressive.  Consequently, an award of exemplary or punitive

---

[28] *See Korea Supply Co. v. Lockheed Martín Corp.*, 29 Cal.4th 1134, 1153 (2003).

damages in an amount sufficient to punish and deter such conduct is justified.

## FOURTH CAUSE OF ACTION

### (Violation of The California Cartwright Act)

### (Cal. Bus. & Prof. Code §§ 16720 *et seq.*)

98.     Plaintiffs hereby allege and incorporate by reference each allegation set forth in Paragraphs 1 through 97 of this FAC, as if set forth in full herein.

99.     This Court has jurisdiction over this Fourth Cause of Action based on the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because this Fourth Cause of Action arises from the same transactions and from a common nucleus of operative facts as alleged in the first federal based cause of action.

100.    During all relevant periods, plaintiffs conducted a substantial volume of business in California.  California is plaintiffs' place of incorporation and principal place of business.  As a result of plaintiffs' business operations and substantial contacts in California, plaintiffs are entitled to the protection of the laws of California and the Cartwright Act.

101.    Defendants conduct a substantial volume of business in California, including but not limited to entering into contracts with ASC facilities, physicians, and patients in California.

102.    Concerted refusals to deal and group boycotts are *per se* offenses under the Cartwright Act.[29]

103.    Defendants entered into and engaged in an unlawful trust in restraint of the trade and commerce and prohibited by and contrary to the public policy of California under California Business and Professions Code section 16720 *et seq*.

104.    Plaintiffs have the requisite standing to assert claims under California Business and Professions Code section 16720 *et seq.* because they are participants

---

[29] *See Oakland-Alameda County Builder's Exchange v. F.P. Lathrop Construction Co.*, 4 Cal.3d 354, 365 (1971); *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 198 Cal.App.4th 1366, 1374 (2011).

Blecher Collins
Pepperman & Joye

and competitors in the relevant market for the provision of surgical services Santa Clara/San Mateo Counties in Northern California ASCs and have suffered injury by reason of defendants' unlawful restraints, including but not limited to the unreasonable and substantial restriction of competition for the provision of surgical services in Santa Clara/San Mateo Counties in Northern California, significantly limited consumer choice for ambulatory surgical services in the geographic area, and consumers' reduced access to plaintiffs' competitive ambulatory surgical centers.

105. The coordinated and collective actions of the defendants have the purpose and effect of eliminating or substantially restricting competition in Santa Clara/San Mateo Counties between plaintiffs and ASC competitors, and inducing or coercing a group boycott of or concerted refusal to deal among surgeons and patients not to deal with plaintiffs. Defendants have also combined to restrain competition by consistently refusing to pay, or underpaying, plaintiffs' claims for ASC facility fees, and refusing to enter into reasonable and non-discriminatory facilities fee in-network contracts with plaintiffs.

106. The anticompetitive effects of these restraints outweighs any purported beneficial effects on competition.

107. As a direct and proximate result of defendants' combinations and contracts to restrain trade and eliminate competition, plaintiffs have suffered injury and have been deprived of the benefits of free and fair competition on the merits. Defendants' anticompetitive conduct, unless restrained, will continue to unreasonably limit, reduce or suppress actual and potential competition and intrastate commerce in the Santa Clara/San Mateo Counties market for surgical services through ambulatory surgical centers; raise substantial barriers to entry into the market for ambulatory surgical centers; significantly restrict or eliminate consumer choice as to selection, price and quality of facilities and surgeons; and artificially restrain consumer access to plaintiffs' competitive surgical centers in the

1 geographic market.

2 108. Because of defendants' anticompetitive actions, plaintiffs have suffered

3 the loss of reasonably anticipated sales and profits, an increase in expenses, and

4 other damages to be proven at trial. Pursuant to California Business and Professions

5 Code section 16750, plaintiffs are entitled to recover compensatory and treble

6 damages, injunctive relief, and reasonable attorneys' fees and costs of suit.

7 **FIFTH CAUSE OF ACTION**

8 **(Unfair Competition in Violation of**

9 **Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

10 109. Plaintiffs hereby allege and incorporate by reference each allegation set

11 forth in Paragraphs 1 through 108 of this FAC, as if set forth in full herein.

12 110. This Court has jurisdiction over this Fifth Cause of Action based on the

13 doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because this Fifth Cause of

14 Action arises from the same transactions and from a common nucleus of operative

15 facts as alleged in the first federal law based cause of action.

16 111. Section 17200 *et seq.* of the California Business & Professions Code is

17 written in the disjunctive and broadly covers three varieties of unfair competition –

18 acts that are unlawful or unfair or fraudulent.[30] The statute's intent and purpose is to

19 protect both consumers and competitors by promoting fair competition in

20 commercial markets for goods and services. The coverage of Section 17200 *et seq.*

21 is broad and intended to enjoin on-going wrongful business conduct in whatever

22 context such activity might occur.[31]

23 112. Each plaintiff is a "person" within the meaning of California Business

24 & Professions Code § 17201.

25

26 ───────────────
[30] *See People ex rel. Lockyer v. Fremont Life Ins. Co.*, 104 Cal.App.4th 508, 515 (2002).

27 [31] *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20

28 Cal.4th 163, 181 (1999).

Blecher Collins
Pepperman & Joye

113.   As alleged herein, defendants' concerted conduct constitutes "unfair" business practices.  A practice may be deemed unfair even if not specifically proscribed by some other law.  Conduct that significantly threatens or harms competition, or threatens an incipient violation of an antitrust law, may be deemed to be "unfair."[32]

114.   As alleged herein, defendants' anticompetitive conduct is also "unlawful."  Within the meaning of section 17200, virtually any violation of any civil or criminal federal, state or municipal, statutory, regulatory, court-made or local law can serve as a predicate for an "unlawful" claim.[33]  The violations of the federal antitrust laws as alleged herein, satisfy the "unlawful" prong of section 17200.

115.   By reason of, and as a direct and proximate result of defendants' unfair and unlawful practices and conduct, each plaintiff has suffered, and will continue to suffer, financial injury to its business and property.

116.   Defendants' unfair and unlawful conduct has caused harm to each plaintiff, competition and consumers.  Nonetheless, the UCL is a strict liability statute and it is not necessary to show that defendants intended to injure or harm plaintiffs.[34]

117.   Whether a business practice is unlawful or unfair is a question of fact.[35]

118.   An act may violate the UCL even if the unlawful practice affects only one victim.[36]

---

[32] *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 186-87 (1999); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 994 (9th Cir. 2000).

[33] *See Law Offices of Mathew Higbee v. Expungement Assistance Services*, 214 Cal.App.4th 544, 553 (2013).

[34] *See Prata v. Superior Court*, 91 Cal.App. 4th 1128, 1137 (2001).

[35] *See Community Assisting Recovery, Inc. v. Aegis Sec. Ins. Co.* 92 Cal.App.4th 886, 894-95 (2001).

[36] *See Blanks v. Seyfarth Shaw LLP*, 171 Cal.App. 4th 336, 364 (2009).

Blecher Collins
Pepperman & Joye

119. Pursuant to Business & Professions Code section 17203, the entry of permanent and mandatory injunctive relief against each defendant is necessary to enjoin defendants' ongoing unfair and/or unlawful business conduct. Plaintiffs can seek an injunction whether or not restitution is also available.[37] An injunction is needed to enable and restore competition in the market for surgical services rendered through ambulatory surgical centers in the relevant geographic market.

## **PRAYER FOR RELIEF**

WHEREFORE each plaintiff prays that this Court adjudges and decrees as follows:

1. The conduct alleged in the First Cause of Action herein be adjudged to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

2. The conduct alleged in the Second Cause of Action herein be adjudged to constitute intentional interference with prospective economic advantage;

3. The conduct alleged in the Third Cause of Action herein be adjudged to constitute intentional interference with actual contractual relationships;

4. The conduct alleged in the Fourth Cause of Action herein be adjudged to constitute a violation of the Cartwright Act;

5. The conduct alleged in the Fifth Cause of Action herein be adjudged to be unfair and/or unlawful in violation of Section 17200 *et seq.* of the California Business & Professions Code;

6. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), plaintiffs recover treble the actual amount of their damages sustained by reason of those federal antitrust violations;

7. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), plaintiffs be awarded their reasonable attorneys' fees and costs of litigation;

---

[37] *See White v. Trans Union, LLC*, 462 F. Supp. 2d 1079, 1083-84 (C.D. Cal. 2006).

Blecher Collins
Pepperman & Joye

1    8.    Pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), the

2  anticompetitive, predatory and/or exclusionary conduct be permanently enjoined;

3    9.    Plaintiffs be awarded punitive or exemplary damages on their tort claim

4  under the Second Cause of Action;

5    10.    Plaintiffs be awarded punitive or exemplary damages on their tort claim

6  under the Third Cause of Action;

7    11.    Pursuant to Section 17203 of the California Business & Professions

8  Code, the unfair and/or unlawful business practices of defendants be permanently

9  enjoined;

10    12.    Pursuant to Section 1021.5 of the California Code of Civil Procedure,

11  each plaintiff be awarded reasonable attorneys' fees; and

12    13.    For such other and further relief as the Court deems just and proper.

15  Dated:  October 27, 2015    BLECHER COLLINS PEPPERMAN & JOYE
16                              MAXWELL M. BLECHER
                                DONALD R. PEPPERMAN
17                              TAYLOR C. WAGNIERE


19                              By:   _____
20                                          /s/ *Maxwell M. Blecher*
                                          Maxwell M. Blecher
21                                        Attorneys for Plaintiffs

# **DEMAND FOR JURY TRIAL**

Each named plaintiff hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: October 27, 2015
BLECHER COLLINS PEPPERMAN & JOYE
MAXWELL M. BLECHER
DONALD R. PEPPERMAN
TAYLOR C. WAGNIERE


By: _____/s/ *Maxwell M. Blecher*_____
Maxwell M. Blecher
Attorneys for Plaintiffs

77539.1

FIRST AMENDED CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Blecher Collins
Pepperman & Joye