1

2

3

4              **UNITED STATES DISTRICT COURT**

5            **NORTHERN DISTRICT OF CALIFORNIA**

6                    **SAN JOSE DIVISION**

7

8   BAY AREA SURGICAL MANAGEMENT              Case No.  15-cv-01416-BLF
    LLC, et al.,

9                      Plaintiffs,            **ORDER (1) GRANTING DEFENDANT
                                              E3'S MOTION TO DISMISS WITH**

10           v.                               **PARTIAL LEAVE TO AMEND AND (2)
                                              GRANTING DEFENDANT AETNA'S**

11  AETNA LIFE INSURANCE COMPANY, et          **MOTION TO DISMISS WITH LEAVE
    al.,                                      TO AMEND**

12                     Defendants.            [Re:  ECF 66, 68]

13

14          Plaintiffs Bay Area Surgical Management, LLC, Bay Area Surgical Group, Inc., Forest

15   Surgery Center, L.P., SOAR Surgery Center, LLC, Knowles Surgery Center, LLC, National

16   Ambulatory Surgery Center, LLC, and Los Altos Surgery Center, L.P. bring this action alleging

17   violations of the Sherman Act, intentional interference with prospective economic advantage,

18   intentional interference with actual contractual relations, violations of California's antitrust statute,

19   the Cartwright Act, and violations of California's Unfair Competition Law against Defendants E3

20   Healthcare Management LLC, Alpine Healthcare, LLC, Bascom Surgery Center, L.P., Campus

21   Surgery Center L.P., El Camino Ambulatory Surgery Center, LLC, Silicon Valley Surgery Center,

22   L.P., and Waverley Surgery Center, L.P.'s (collectively "E3"), Defendant United Healthcare

23   Services, Inc., and Defendant Aetna Life Insurance Company ("Aetna").  On May 25, 2016,

24   Plaintiffs dismissed Defendant United Healthcare with prejudice.  ECF 86.  Before the Court are

25   Defendant E3 and Defendant Aetna's motions to dismiss Plaintiffs' First Amended Complaint

26   ("FAC") pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons discussed below, Defendant E3's

27   motion to dismiss is GRANTED with partial leave to amend and Defendant Aetna's motion to

28   dismiss is GRANTED with leave to amend.

United States District Court
Northern District of California

## I.   BACKGROUND

The following factual allegations are taken from Plaintiffs' FAC.  Plaintiff Bay Area Surgical Management, LLC manages ambulatory surgical centers, including some owned and operated by the other Plaintiffs.  FAC ¶ 3.  The remaining six Plaintiffs own and operate ambulatory surgery centers at which outpatient surgeries are performed.  *Id*. ¶¶ 4-9.  Defendant Aetna is a health insurance company doing business in California.  *Id*. ¶ 10.  Defendants E3 Healthcare Management, LLC and Alpine Healthcare, LLC manage ambulatory surgery centers in Northern California.  *Id*. ¶¶ 12-13.  The remaining five E3 Defendants own and operate ambulatory surgery centers at which outpatient surgeries are performed.  ¶¶ 14-18.

Defendant Aetna is a "goliath" in the highly concentrated health insurance industry and has health benefit plans through which their insureds are reimbursed for covered healthcare services, including outpatient surgery services such as those provided by the centers managed by Plaintiff and the E3 Defendants.  *Id.* ¶¶ 26, 32.  The amount reimbursed by the health benefit plans depends on whether the services were performed by in-network or out-of-network providers.  *Id*. ¶ 27.  In-network service providers agree to a lower reimbursement rate in exchange for participation in Aetna's networks.  *Id*.  Insureds who utilize in-network service providers are required only to pay any applicable copayment or coinsurance along with the deductible amount provided in the plan.  *Id*.  On the other hand, out-of-network service providers are reimbursed at specific rates delineated in each insureds' benefit plan.  *Id*. ¶ 28.  Insureds are therefore responsible for any applicable copayment, coinsurance, and deductible amount as well as the difference charged by the out-of-network service provider and the amount reimbursed by Defendant Insurers.  *Id*.

In early 2010 and continuing thereafter, Plaintiffs allege that Defendants conspired to suppress competition in the ambulatory surgery market in Santa Clara and San Mateo Counties. *Id*. ¶ 23.  According to Plaintiffs, the conspiracy began on March 18, 2010 during the California Ambulatory Surgery Association trade association meeting.  *Id*. ¶ 46.  Dr. Jay Pruzansky, Managing Member of Alpine Healthcare and Director of E3 Healthcare LLC, approached Mark Reynolds, Manager at Aetna, to discuss his belief that Plaintiffs were charging exorbitant surgical fees.  *Id*.  That same day, Mr. Reynolds reported back to Aetna about his meeting with Dr.

United States District Court
Northern District of California

1    Pruzansky, stating, "How can we bring down the hammer on these guys?"  *Id.*

2        On March 24, 2010, Dr. Pruzansky contacted Mary Hull, in Aetna's Special Investigations

3    Unit, about filing a complaint against Plaintiffs with the California Medical Board.  *Id.* ¶ 47.  In

4    response, Aetna asked for contact information for a representative at United Healthcare.  *Id.*  Dr.

5    Pruzansky provided information for Carolyn Ham, United Healthcare's Associate General

6    Counsel.  *Id.*

7        In April 2010, Ms. Hull advised Dr. Pruzansky that Aetna had conducted research on

8    information brought to its attention by him and that Aetna wanted to write a letter to the California

9    State Attorney General and the Office of the Inspector General.  *Id.* ¶48.

10       On May 20, 2010, as a direct result of Dr. Pruzansky's encouragement and prodding,

11   Aetna sent a request to the Office of Inspector General of the Department of Health and Human

12   Services, the Attorney General of California, and the California Department of Public Health that

13   they "commence an investigation" into Plaintiffs' financial and marketing practices.  *Id.* ¶49.  No

14   action was initiated or taken by any of these agencies or entities against Plaintiffs as a result of

15   Aetna's request.  *Id.*

16       In February 2011, Dr. Pruzansky told Mr. Reynolds that he was frustrated and was

17   considering canceling his Aetna's contracts at 4 ASCs.  *Id.* ¶ 50.  According to Plaintiffs, this

18   threat to withdraw came in response to Plaintiffs' acquisition of an ASC in Santa Clara or San

19   Mateo County and the opening of new additional ASCs.  *Id.*  Dr. Pruzansky, in a lengthy and

20   detailed memo, demanded that Aetna take a series of actions against Plaintiffs, including limiting

21   payments to Plaintiffs, terminating the in-network contracts of physicians referring cases to

22   Plaintiffs, auditing Plaintiffs' patients for payment collection, and reporting Plaintiffs' billing

23   practices to state authorities.  *Id.*  Plaintiffs allege this memo was "the blueprint for the closely

24   coordinated and orchestrated plan to drive [Plaintiffs] out of the market."  *Id.*

25       In response, Mr. Reynolds and Dr. Pruzansky met in-person at another trade association

26   meeting held in Dana Point, California.  *Id.* ¶ 52.  Dr. Pruzansky followed-up the meeting with an

27   e-mail to Mr. Reynolds on April 4, 2011 advising him that Plaintiffs had announced they were

28   opening another "non-par facility" in the Los Gatos-San Jose area.  *Id.*  In what Plaintiffs purport

United States District Court
Northern District of California

United States District Court
Northern District of California

1    was a thinly veiled threat, Dr. Pruzansky stated that "It continues to be a challenge to stay in-

2    network and do the right thing."  *Id.*

3        That same month, Defendants E3 and Aetna jointly retained Christine Hall, an attorney, to

4    investigate and draft a complaint that was filed by Aetna with the Medical Board of California

5    regarding Plaintiffs' conduct.  *Id.* ¶ 53.  Bryan Westerfeld, an outside attorney for United

6    Healthcare, also participated in the discussions.  *Id.* ¶ 54.  Between September and December

7    2011, high level management and legal representatives exchanged 67 written communications and

8    participated in numerous conferences concerning Plaintiffs' conduct and the Medical Board

9    Complaint.  *Id.* ¶ 55.  On November 1, 2011, Aetna filed a formal written Complaint with the

10   California Medical Board.  *Id.*  Plaintiffs note that they are not predicating any of their liability

11   claims on the filing of the Medical Board Complaint or any of the letters written to any

12   governmental agency or entity.  *Id.* at 18 n.15.

13       In early 2010, after the Medical Board did not issue any rulings or take any action against

14   Plaintiffs, Aetna and United Healthcare filed substantially similar lawsuits against Plaintiffs in

15   Santa Clara Superior Court.  *Id.* ¶ 56.  Plaintiffs state they are not predicating any of their liability

16   claims on the filing or maintenance of either of these lawsuits.  Plaintiffs contend that both suits

17   absurdly allege that "because [Aetna and United Healthcare] are busy processing millions of

18   claims, they do not have time to review all out-of-network claims for ASC services for accuracy

19   and reasonableness and have therefore on occasions made payments to [Plaintiffs] which in

20   hindsight [] should have been reimbursed at lesser amounts."  *Id.*  After filing the lawsuit, Karen

21   Jansen, an E3 employee, wrote to Andrea Tyler, an Aetna employee, recognizing what Plaintiffs

22   argue was the true purpose of the lawsuits: "[h]ow do you feel about [Plaintiffs'] take on this

23   whole lawsuit stating this is Aetna's way of strong-arming them to take a below market contract?"

24   *Id.*

25       From 2011 and continuing to the present, Plaintiffs allege Aetna and United Healthcare

26   boycotted, intimidated, and harassed them, their active and potential surgeons, and their actual and

27   prospective patients.  *Id.* ¶ 57.  For example, Aetna's Director of Network Management sent

28   written warnings to one or more surgeons affiliated with Plaintiffs stating that Aetna was

1  "concerned" about the practice of referring patients to Plaintiffs' "nonparticipating" facilities.  *Id.*
2  Aetna stated that "continued use of nonparticipating facilities" would result in "your profile on
3  DocFind® will inform our [patient] members about the additional costs associated with using out-
4  of-network providers."  *Id.*

5      In April 2012 and continuing through the present, Plaintiffs allege United Healthcare sent
6  letters to Plaintiffs' surgeons threatening them with "termination" of their carrier agreements if
7  they did not stop referring patients to Plaintiffs' facilities.  *Id.* ¶ 58.  United Healthcare also posted
8  designations for surgeons affiliated with Plaintiffs that stated these "care provider[s have] not met
9  guidelines for cost-efficiency care."  *Id.* ¶ 60.  United Healthcare also contacted patients using
10  Plaintiffs' facilities to advise them that the "allowable amount" of reimbursement was lower than
11  the amount billed by Plaintiffs.  *Id.* ¶ 63.

12      Plaintiffs also allege that Aetna sent written questionnaires to patients that had submitted
13  claims for services performed at Plaintiffs' facilities.  *Id.* ¶ 62.  These forms demanded
14  information about billing and payment practices, disclosures of the surgeons relating to financial
15  ownership, the level of care provided, whether they had seen negative press articles about
16  Plaintiffs, and requested a telephone interview.  *Id.*

17      Plaintiffs allege the Defendants' coordinated action has had disastrous effects on revenues,
18  profits, and growth.  *Id.* ¶ 64.  From their peak in 2010-2011 through 2014, Plaintiffs' revenues
19  have declined in excess of $46.2 million—a 45% decline—and the number of surgical procedures
20  performed at BASM facilities has declined 20%.  *Id.*  United Healthcare has refused to pay for at
21  least 154 surgical procedures, amounting to $3 million in losses, and Aetna has paid zero in 124
22  cases, amounting to another $3 million loss.  *Id.*

23      Based on the forgoing conduct, Plaintiffs brought this suit alleging Defendants violated
24  Section 1 of the Sherman Act.  *Id.* ¶ 68.  Moreover, Plaintiffs allege that Defendants' conduct
25  wrongfully interfered with actual and prospective contractual relationships between Plaintiffs and
26  physicians Dr. Andy Yu, Dr. Peter Yuan, Dr. Julia Kahan, Dr. Norman Kahan, Dr. Samir Sharma,
27  Dr. Jeff Gutman, and Dr. Shahram Gholami.  *Id.* ¶¶ 86, 94.

28

United States District Court
Northern District of California

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) concerns what facts a plaintiff must plead on the face of the complaint.  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Any complaint that does not meet this requirement can be dismissed pursuant to Rule 12(b)(6).  A "short and plain statement" demands that a plaintiff plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which requires that "the plaintiff plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

### B.   Leave to Amend

Under Rule 15(a), a court should grant leave to amend "when justice so requires," because "the purpose of Rule 15…[is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).  A court may deny leave to amend for several reasons, including "undue delay, bad faith,…[and] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

### C.   Request for Judicial Notice

Although a district court generally may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, the Court may take judicial notice of documents referenced in the complaint, as well as matters in the public record, without converting a motion to dismiss into one for summary judgment. *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001), overruled on other grounds by *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002). In addition, the Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records,

United States District Court
Northern District of California

including judgments and other court documents, are proper subjects of judicial notice. *See, e.g.,*
*United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007).

Aetna requests judicial notice of court documents from prior actions filed by the parties in
California Superior Court. ECF 68.  Plaintiffs do not object to the any of Aetna's requests.  Since
these documents are court documents or part of the court record, they are the proper subject of
judicial notice and the Court GRANTS Aetna's request for judicial notice.

E3 requests judicial notice of two filings from a prior state court action and a release of all
claims signed by Plaintiffs and E3.  ECF 67 at 2.  Plaintiffs object to E3's request for judicial
notice of the release because "the scope of a release is a fact issue, [and] it would violate
[Plaintiffs'] due process rights to resolve this issue without first affording [Plaintiffs] the
opportunity to conduct discovery."  Opp. to E3 8, ECF 76.  Plaintiffs' objection does not go to the
existence of the release but whether it is appropriate for the Court to resolve its scope. As the
Court explains *infra* III.A.1, the Court is not analyzing the scope of the release in addressing E3's
motion to dismiss.  Accordingly, Plaintiffs' objection to the release is overruled.  Thus, the Court
GRANTS E3's request for judicial notice as two of the documents are court documents, and the
existence of the release, which has been signed by Plaintiffs, cannot be reasonably questioned by
either party.

## III.     DISCUSSION

The Court first addresses E3's argument that res judicata precludes this action and then turns
to the parties' arguments surrounding the sufficiency of Plaintiffs' antitrust allegations.

### A.     E3 Has Not Shown Res Judicata Precludes Plaintiffs' Claims

E3 argues that all of Plaintiffs' claims are barred by the doctrine of res judicata.  E3 Mot.
9-12, ECF 66.  E3 also moves to dismiss Plaintiffs' causes of actions under the Sherman Act,
California Cartwright Act, and California Unfair Competition Law because Plaintiffs have not
adequately alleged a *per se*, "quick look," or "rule of reason," violation of Section 1 of the
Sherman Act.  *Id*. at 12-23.  Finally, E3 moves to dismiss Plaintiffs' intentional interference with
prospective economic advantage and intentional interference with actual contractual relations on
the basis that Plaintiffs have not alleged any specific economic or contractual relationships or the

1    breach or disruptions of such relationships.  *Id.* at 24-25.  Because the Court concludes that

2    Plaintiffs' claims against E3 are precluded by res judicata, the Court does not reach E3's

3    remaining arguments.

4         "Res judicata, or claim preclusion, prohibits lawsuits on any claims that were raised or

5    could have been raised in a prior action."  *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir.

6    2002) (emphasis and internal quotation marks omitted).  Where, as here, an argument for

7    application of res judicata is predicated on a state court judgment, courts must apply the res

8    judicata law of that state.  *See Palomar Mobilehome Park Ass'n v. City of San Marcos*, 989 F.2d

9    362, 364 (9th Cir. 1993) ("The Full Faith and Credit Act, 28 U.S.C. § 1738, requires that we give

10   the same preclusive effect to a state–court judgment as another court of that state would give.")

11   (citations omitted).

12        Under California law, res judicata "precludes a party from relitigating (1) the same claim,

13   (2) against the same party, (3) when that claim proceeded to a final judgment on the merits in a

14   prior action."  *Adam Bros. Farming, Inc. v. County of Santa Barbara*, 604 F.3d 1142, 1148-49

15   (9th Cir. 2010) (citing *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888 (2002)).  "[A] defendant

16   may raise the affirmative defense of res judicata by way of a motion to dismiss under Rule

17   12(b)(6) where there are no disputed issues of fact."  *Merritt v. Countrywide Fin. Corp.*, Case No.

18   09-cv-01179-BLF, 2015 WL 5542992, at *9 (N.D. Cal. Sept. 17, 2015) (citing *Scott v. Kuhlmann*,

19   746 F.2d 1377, 1378 (9th Cir. 1984)).

20                        **1.  Identity of Claims**

21        To determine what constitutes the "same claim," California courts employ the "primary

22   rights theory."  *Brodheim v. Cry*, 584 F.3d 1262, 1268 (9th Cir. 2009) (citation and quotation

23   marks omitted).  "That concept 'is indivisible: the violation of a single primary right gives rise to

24   but a single cause of action.'"  *San Diego Police Officers' Ass'n v. San Diego City Emps. Ret.*

25   *Sys.*, 568 F.3d 725, 734 (2009) (quoting *Crowley v. Katleman*, 8 Cal. 4th 666, 680 (1994)).  That is,

26   "if two actions involve the same injury to the plaintiff and the same wrong by the defendant, then

27   the same primary right is at stake even if in the second suit the plaintiff pleads different theories of

28   recovery, seeks different forms of relief and/or adds new facts supporting recovery."  *Id.*  (quoting

United States District Court
Northern District of California

*Eichman v. Fotomat Corp.*, 147 Cal. App. 3d 1170, 1174 (1983). In conducting a primary rights analysis, "[w]hat is critical to the analysis is the harm suffered; that the same facts are involved in both suits is not conclusive." *Id.* (quoting *Agarwal v. Johnson*, 160 Cal. Rptr. 141, 155 (1970); *see also Merritt*, 2015 WL 5542992, at *9.

E3 argues that the pending action and the state court action involve the same primary right. E3 Mot. 10-11, ECF 66.  According to E3, in this action, Plaintiffs are seeking to recover damages related to a decrease in revenues and profits and loss of goodwill because E3's alleged conduct caused physicians and patients to avoid using Plaintiffs' surgery centers.  *Id.* (citing FAC ¶¶ 21, 68, 86).  In the state court action, E3 contends Plaintiffs were seeking redress over the same harm, where they sought damages related to the "injury to [Plaintiffs'] business and profession" and "loss of reputation" because physicians and patients were persuaded to avoid using Plaintiffs' surgery centers.  *Id.* (citing Exh. A to RJN, ¶¶ 19, 27-28).

Plaintiffs respond that the state court action and this action involve different primary rights.  E3 Opp. 7-8, ECF 76.  Plaintiffs argue that the state court action, which involved defamation laws, implicated the primary right of injury to reputation.  *Id.* at 7.   In contrast, Plaintiffs argue that this action, involving antitrust and unfair competition laws, seeks to preserve economic freedom and the free enterprise system.  *Id.*  Plaintiffs argue that injury to its reputation (state court action) is not the same as injury to competition in the relevant market or injury to patients as a result of antitrust violations.  *Id.*  In addition, Plaintiffs characterize E3's motion as arguing that this lawsuit is barred by a settlement reached in the state court action.  *Id.*  Plaintiffs' argue that agreements that prospectively waive antitrust violations are generally void and the scope of the settlement agreement is a fact issue that cannot be resolve on a motion to dismiss.  *Id.* at 7-8.

The Court agrees with E3 and finds that Plaintiffs' claims are precluded by res judicata.  In the state court action, Plaintiffs alleged E3 made defamatory statements and broadly stated the harm caused by those statements as "steer[ing] physicians and potential patients [away from Plaintiffs'] surgery centers," Exh. A to RJN ¶ 19, ECF 67-1, "loss of reputation," *id.* ¶ 27, "injury to Plaintiffs' business and profession," *id.* ¶ 28.  In this action, although Plaintiffs' style their

9

action as an antitrust and unfair competition suit, they describe the harm as "disrupt[ing] and crippl[ing] Plaintiffs' business," FAC ¶ 21, loss of business and profits, *id*. ¶ 64 (describing decline in revenue and surgical procedures), persuading physicians and patients not to deal with Plaintiffs, *id*. ¶ 68. *See also id*. ¶¶ 70 (describing loss of patients), 81 (describing financial injury and deprivation of revenues and profits).  Thus, the same harms were at stake in the state action and this suit.

Plaintiffs' arguments in opposition are unpersuasive.  First, Plaintiffs argue that different primary rights are involved in the federal and state actions because defamation involves injury to reputation while antitrust and unfair competition laws seek to preserve economic freedom and the free enterprise system.  E3 Opp. 7, ECF 76.  Plaintiffs' argument overlooks the fact that the focus of the primary rights inquiry is the harm alleged, not the specific legal theory pled in the complaint. The Ninth Circuit analyzed an analogous circumstance in *Monterey Plaza Hotel Ltd. Pshp. v. Local 483 of the Hotel Empls. Union*, 215 F.3d 923 (9th Cir. 2000).  In that matter, there had been protracted litigation between a hotel and a union in state court.  *Id*. at 925-26.  The hotel sued the union for injunctive relief against violent picketing and claimed that the union's actions harmed its business.  *Id*. at 925.  After that action was resolved by stipulation, the hotel filed a second suit alleging the union made defamatory statements during a television interview and claimed that it suffered a loss of business.  *Id*.  The hotel then filed a federal RICO action alleging the union engaged "in a pattern of illegal acts, including violence, extortion, illegitimate economic coercion, mail and wire fraud, and intimidation, that amounted to racketeering activity." *Id*.  After the second state court action concluded, the district court dismissed the federal action on res judicata grounds.  *Id*.  The Ninth Circuit agreed, holding that even though the actions had different legal theories, "the primary rights at stake in [the two state actions] are the same as those at issue in the present action: namely, the protection of the Hotel's business and its right to be free from the Union's disruptive activities. The harm alleged is fundamentally the same injury to business reputation and customer goodwill." *Id*. at 928.  "While the Hotel may have added new acts to its federal complaint, the new allegations are insufficient to establish an independent or different primary right than that which the state courts have already addressed." *Id*.  Similarly, here, while

10

United States District Court
Northern District of California

1  Plaintiffs are pursuing different legal theories in their federal and state actions, the nature of the

2  harm alleged is the same in both actions.  Plaintiffs cannot prevent the application of res judicata

3  by asserting new facts, as these facts, do not establish a different primary right.

4  Plaintiffs' other argument—that a settlement agreement generally may not prospectively

5  waive antitrust claims and the scope of such an agreement may not be resolved at the pleading

6  stage—is premised on the belief that E3 is seeking to preclude this lawsuit based on the settlement

7  agreement.  E3 Opp. 7-8, ECF 76.  However, E3 is not arguing the settlement agreement prevents

8  this lawsuit but instead, is arguing this lawsuit is barred by res judicata.  The doctrine of res

9  judicata is based on the pleadings alone.

10  **2.  Same Parties**

11  E3 argues the "same party" requirement of res judicata is met because "the same seven

12  BASM-related entities sued E3 Healthcare Management, LLC, Alpine Healthcare, LLC,

13  Bascom Surgery Center, L.P., Campus Surgery Center, L.P., Silicon Valley Surgery Center, L.P.,

14  and Waverley Surgery Center, L.P. Each of those entities is named as a defendant in this action."

15  E3 Mot. 10, ECF 66 (internal citations omitted).  In a footnote, Plaintiffs counter that Defendant

16  El Camino Ambulatory Surgery Center, LLC was not a party to the state court action.  E3 Opp. 7

17  n.2, ECF 76.  In their reply brief, E3 did not address Plaintiffs' footnote but at oral argument,

18  argued that Defendant El Camino is "clearly" in privity with the other E3 Defendants because

19  "they are alleged to be essentially the same grouping in this case." Transcript 18:6-13, ECF 84.

20  California "courts examine the practicalities of the situation and attempt to determine

21  whether plaintiffs are sufficiently close to the original case to afford application of the principle of

22  preclusion." *Armstrong v. Armstrong*, 15 Cal. 3d 942, 951 (1976) (internal citations and quotation

23  marks omitted).  "[P]rivity requires the sharing of an identity or community of interest, with

24  adequate representation of that interest in the first suit, and circumstances such that the nonparty

25  should reasonably have expected to be bound by the first suit." *DKN Holdings LLC v. Faerber*,

26  61 Cal. 4th 813, 826 (2015) (internal quotations omitted).

27  The issue of whether parties are in privity under California law cannot simply be glossed

28  over without argument by the party seeking to invoke res judicata.  *See, e.g. DKN Holdings*, 61

Cal. 4th at 826 (holding joint and several liability does not put co-obligors in privity); *Patel v. Crown Diamonds, Inc.*, 247 Cal. App. 4th 29, 40 (2016) (holding business partners are not in privity where plaintiff alleged they were independently liable). "The burden of proving that the requirements for application of res judicata have been met is upon the party seeking to assert it as a bar or estoppel." *Patel*, 247 Cal. App. 4th at 40 (quoting *Vella v. Hudgins*, 20 Cal. 3d 251, 257 (1977)). Plaintiffs' FAC refers to all the E3 Defendants as a single entity and contains no separate allegations concerning Defendant El Camino Ambulatory Surgery Center, LLC. While it is certainly possible El Camino is in privity with the other E3 Defendants, El Camino has not shown this. Thus, the Court finds the six E3 Defendants who were also defendants in the state court satisfy the same parties requirement of *res judicata* but El Camino does not at this time.

### 3. Final Judgment

E3 argues and Plaintiffs do not dispute that the prior state court action was dismissed with prejudice following a settlement between the parties. Exh. C to RJN , ECF 67-3 (settlement agreement whereby plaintiffs agreed to dismiss the state court action and defendants waived the award of sanctions made by the state court and further released plaintiffs and plaintiffs' counsel from any claims for malicious prosecution). Under California law, "[a] dismissal with prejudice following a settlement constitutes a final judgment on the merits." *Estate of Redfield,* 193 Cal. App. 4th 1526, 1553 (2011). Accordingly, this factor of res judicata has been met.

### 4. Summary

In sum, the E3 Defendants named in the state court action have met all three factors and El Camino has only shown that two out of the three res judicata factors have been met. While Defendant El Camino may potentially be in privity with the other E3 Defendants, El Camino has not shown that. The Court thus grants the E3 Defendants' (except El Camino) motion to dismiss on the basis of res judicata. The Court further grants the motion to dismiss as to El Camino on the grounds that no allegations regarding El Camino's conduct are alleged and thus, no claim is properly asserted against it. Plaintiffs are granted leave to amend as to El Camino. However, should Plaintiffs choose to amend their pleading, they should give careful consideration to whether they can overcome the application of res judicata especially since Plaintiffs' FAC

United States District Court
Northern District of California

1   contains no separate allegations against El Camino and refers to the E3 Defendants as a single

2   grouping throughout the pleading.

3        **B.**   **Plaintiffs Have Not Sufficiently Alleged a Violation of the Sherman Act**

4            **1.**  **Sherman Act**

5      Section 1 of the Sherman Act ("Section 1") prohibits unreasonable contracts or

6   combinations in restraint of trade.  15 U.S.C. § 1.  A plaintiff may allege violations of Section 1

7   under one or more of the following "three rules of analysis: the rule of reason, per se, or quick

8   look." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013).  Under the rule

9   of reason, a plaintiff must plead four separate elements: (1) the existence of a conspiracy, (2) the

10  intention on the part of the co-conspirators to harm or restrain competition, (3) actual injury to

11  competition, and (4) that the plaintiffs suffered "antitrust injury" as a result of the conspiracy.  *See*

12  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  The per se approach has

13  been applied to group boycotts when there has generally been "joint efforts by a firm or firms to

14  disadvantage competitors," *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d

15  947, 949 (9th Cir 1998) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing

16  Co.*, 472 U.S. 284, 293-94 (1985)), but the Supreme Court has cautioned that "the category of

17  activities comprising group boycotts 'is not to be expanded indiscriminately.'" *Id.* at 950.  As a

18  result, to help guard against the over-application of per se group boycotts, the Ninth Circuit has

19  identified three characteristics that are indicative of a per se group boycott: "(1) the boycott cuts

20  off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the

21  boycotting firm possesses a dominant market position; and (3) the practices are not justified by

22  plausible arguments that they enhanced overall efficiency or competition." *Id.* (quoting *Hahn v.

23  Oregon Physicians' Serv.*, 868 F.2d 1022, 1030 (9th Cir. 1988)).  Finally, a quick look analysis

24  may be used where "an observer with even a rudimentary understanding of economics could

25  conclude that the arrangements in question would have an anticompetitive effect on customers and

26  markets." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011) (citing

27  *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)).

28      For a Section 1 antitrust claim, the complaint must allege facts "plausibly suggesting (not

merely consistent with) a conspiracy.  It is not enough merely to include conclusory allegations that certain actions were the result of a conspiracy; the plaintiff must allege facts that make the conclusion plausible."  *Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (internal citations and quotations omitted).  A court cannot "infer an anticompetitive agreement when factual allegations just as easily suggest rational, legal business behavior." *Id*. at 1130.

### 2.   Plaintiffs Have Not Sufficiently Alleged a Rule of Reason Antitrust Claim

Under the rule of reason, Plaintiffs must adequately allege (1) the existence of a conspiracy; (2) the intention on the part of the co-conspirators to harm or restrain competition; (3) actual injury to competition; and (4) that the plaintiffs suffered "antitrust injury" as a result. *Brantley*, 675 F.3d at 1197. A failure to sufficiently plead any of these four elements warrants dismissal of Plaintiffs' Sherman Act claims. *See id*.

### a.   Existence of a Conspiracy

Defendants argue that Plaintiffs' conspiracy theory is not supported by sufficient facts and does not make economic sense. E3 Mot. 20-23, ECF 66, Aetna Mot. 6-12, ECF 68.  Plaintiffs respond that they alleged plausible concerted conduct, Opp. to E3 16-20, ECF 76, and that their conspiracy makes economic sense, Opp. to Aetna 6-11, ECF 75.

The Court agrees with Defendants and finds Plaintiffs have still not plausibly alleged an antitrust conspiracy.  Although Plaintiffs added more allegations regarding the "who, what, where, when" of the conspiracy, those allegations relate to Defendants' government petitioning activities and are immune from antitrust liability under the *Noerr-Pennington* doctrine.  *See* FAC at 18 n. 15 ("BASM is not predicating any of its liability claims herein on the filing of the Medial Board Complaint or any of the letters written to any governmental agency or entity."); *id*. at 18 n. 16 ("BASM is not basing any of its liability claims herein on the filing or maintenance of either of these lawsuits.").  Plaintiffs do not dispute that this conduct is "*Noerr* protected activity," Opp. to E3 17, ECF 76, Opp. to Aetna 7, ECF 75, but relying on *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th Cir. 1982), argue that this conduct may be considered to show the purpose or nature of an unlawful anticompetitive act.  The Ninth Circuit's

United States District Court
Northern District of California

1   decision in *Clipper Exxpress* does not support Plaintiffs' contention that immunized conduct can

2   be considered as part of an overall scheme under the facts of this case.

3          In *Clipper Exxpress*, Clipper, a freight forwarding company, alleged that the defendant

4   trucking company engaged in sham protests and provided fraudulent information to a regulatory

5   agency as part of a larger scheme to stifle competition that included price-fixing and customer

6   allocation.  *Id*. at 1246-63.  The Ninth Circuit concluded that an "unlawful overall scheme do[es]

7   not become lawful because [it] may be enforced by immunized litigation." *Abbott Labs. v. Teva*

8   *Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 429 (D. Del. 2006) (internal citations omitted).  In other

9   words, the *Noerr-Pennington* doctrine cannot be used to retroactively immunize an unlawful

10  scheme, simply because the defendants later attempted to enforce a part of their scheme through

11  petitioning conduct.  *Id*. at 1263-65.  Thus, what Plaintiffs overlook is that *Clipper Express* applies

12  where an antitrust conspiracy has already been established, but does not provide *Noerr* protected

13  activity can establish an antitrust conspiracy in the first instance.  Since Plaintiffs have not

14  plausibly alleged an antitrust conspiracy, the Court does not consider any conduct protected under

15  *Noerr*.

16         Thus, after removing the allegations concerning *Noerr* protected activity, Plaintiffs have

17  not sufficiently alleged facts to plausibly establish a conspiracy. The primary defect with Plaintiffs

18  allegations is that they have, at best, pled parallel conduct by the Defendants.  "[W]hen allegations

19  of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that

20  raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be

21  independent action." *Twombly*, 550 U.S. at 557.  Plaintiffs' allegations that Aetna took action to

22  enforce its in-network agreements with physicians are consistent with insurers acting out of

23  independent and rational self-interest to promote their coverage networks.  As to E3, Plaintiffs'

24  allegations that a representative of E3 complained about Plaintiffs to Aetna is not a plausible

25  evidence of a conspiracy to unlawfully eliminate Plaintiffs from competition but is more plausibly

26  consistent with E3's rational self-interest in complaining about what it perceived to be the

27

28

1  wrongful conduct of one of its competitors.[1]

2     Plaintiffs argue that their allegations should not be discounted because another version of

3  the events might be more plausible.  Opp. to E3 19, ECF 76; Opp. to Aetna 11-12, ECF 75.

4  According to Plaintiffs, their version of events need not be more persuasive than Defendants, but

5  that it only needs to be plausible.   Opp. to E3 19, ECF 76; Opp. to Aetna 11-12, ECF 75 (citing

6  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2012)).

7     The *Twombly* pleading standard has been discussed numerous times by the 9th Circuit and

8  district courts.  "When faced with two possible explanations, only one of which can be true and

9  only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent

10  with' their favored explanation but are also consistent with the alternative explanation. Something

11  more is needed, such as facts tending to exclude the possibility that the alternative explanation is

12  true, in order to render plaintiffs' allegations plausible."  *In re Century Aluminum Co. Sec. Litig.*,

13  729 F.3d 1104, 1108 (9th Cir. 2013).  "[A] tie goes to the plaintiff when there are multiple

14  *plausible* theories at the pleadings stage of litigation." *Electric Props. East, LLC v. Marcus &*

15  *Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014) (emphasis added).

16     The Court perceives no tie here.  Plaintiffs' argument incorrectly assumes that their

17  allegations make out a plausible conspiracy theory.  In order to sufficiently allege a section 1

18  antitrust conspiracy, Plaintiffs "need not rule out the possibility that Defendants were acting

19  independently, [but] Plaintiff[s] must allege facts at the pleading stage 'tending to exclude the

20  possibility of independent action.'"  *Prime Healthcare Servs. v. Serv. Emply. Int'l Union*, Case

21  No. 11-cv-2652-GPC-RBB, 2013 WL 3873074, at *7 (S.D. Cal. July 25, 2013) (citing *Twombly*,

22  550 U.S. at 544).  Having reviewed Plaintiffs' allegations, the Court concludes that the FAC

23  "alleges facts that support—at best—a 'possible' basis to believe that [d]efendants [conspired]…,

24

25  [1] E3 and Aetna's conduct is also consistent with the conduct of parties that believe Plaintiffs
engaged in fraudulent overbilling.  *See* Verdict, *Aetna Life Insurance Co. v. Bay Area Surgical*
26  *Management, LLC*, Case No. 1-12-CV-217943 (Apr. 13, 2016) (awarding $37,452,199 to Aetna).
The Court recognizes that appeals have not been exhausted in that case. *See* Stipulation, *Aetna Life*
27  *Insurance Co. v. Bay Area Surgical Management, LLC*, Case No. 1-12-CV-217943 (June 28,
2016) (stipulating to stay proceedings until July 18, 2016 to delay entry of judgment and appeal
28  deadlines so parties can engage in settlement discussions).  The Court takes judicial notice of both
these filings as they are court documents.

United States District Court
Northern District of California

1   not a 'plausible' one." *Electric Props.*, 751 F.3d at 999 n.8.  As a result, Plaintiffs have not

2   alleged facts tending to exclude independent conduct and thus have not pled a plausible

3   conspiracy. Since Plaintiffs have not alleged sufficient facts to pled a plausible conspiracy, the

4   Court does not address Defendants' argument regarding the economic sense of the alleged

5   conspiracy.

6          b.   Actual Injury to Competition

7        Defendants argue that Plaintiffs have not adequately alleged that Defendants have market

8   power or that there was injury to the market as a whole.  Mot. 13-20, ECF 66, Aetna Mot. 16-19,

9   ECF 68.  Plaintiffs respond that they have alleged both exclusionary anticompetitive effects, a

10  surrogate for market power, and market power, and that they have alleged injury to patients,

11  physicians, and the market, Opp. to E3, 16-23, ECF 76; Opp. to Aetna 17-22, ECF 75.

12         1.   Market Power

13       The Court agrees with Defendants and finds Plaintiffs have not sufficiently pled facts

14  showing that Defendants have market power.  In cases alleging boycotts, Defendants must

15  "possess[] market power or exclusive access to an element essential to competition."  *Nw.*

16  *Wholesale Stationers, Inc. v. Pac. Stationary and Printing Co.*, 472 U.S. 284, 296 (1985).  The

17  Court previously found that Plaintiffs' allegation that Defendants have "substantial influence" on

18  the market was not a sufficient allegation of market power.  Order 11, ECF 61.  In the FAC,

19  Plaintiffs have now added allegations referring to Aetna and United as "goliaths in the highly

20  concentrated industry," FAC ¶ 32, and "dominant players in the market, [that] have the power to

21  control prices, rates and reimbursements for surgical procedures," FAC ¶ 79, referring to the

22  health insurance industry as a "highly concentrated oligopoly consisting primarily of United,

23  Aetna, Cigna, Blue Shield, and Blue Cross," FAC ¶ 78, and referring to E3 as "possess[ing]

24  significant market power and collectively constitute the largest ASC competition to…Plaintiffs,"

25  FAC ¶ 80.  The fact that Defendants are "goliaths" or "dominant players" are nothing more than

26  conclusory allegations and synonyms of Plaintiffs' deficient allegation from the original complaint

27  which alleged that Defendants exercised "substantial influence" on the market.

28       As to the allegation that the health insurers are an "highly concentrated oligopoly," such an

United States District Court
Northern District of California

17

1    allegation is conclusory and reveals no information about the market power of Aetna and United.

2    Relying on *United States v. Visa U.S.A., Inc.*, 344 F.2d 228 (2d Cir. 2003) and *United States v.*

3    *Am. Exp. Co.*, 88 F. sup. 3d 143 (E.D.N.Y. 2015), Plaintiffs argue that other courts have found

4    market power in a highly concentrated oligopoly market like the health insurance industry.  But in

5    both those cases, plaintiffs had detailed allegations of market power in their complaint.  *See*

6    Compl. ¶¶ 22-31, ECF 1, Case No. 98-cv-7076, *Visa U.S.A.*, ("Visa accounted for approximately

7    50% of the dollar volume of transactions…"); Compl.  ¶¶ 54-68, ECF 57, Case No. 10-cv-04496,

8    *Am. Exp.*, ("Visa's share was approximately 43%, while MasterCard had a 27% share, and

9    American Express had a 24% share…In [other] litigation, American Express itself alleged that

10   MasterCard 'exercised market power in the network services market' when MasterCard's 'share

11   was approximately 26%,' quite similar to American Express' share in the market").

12       As to the allegation that E3 constitutes the largest ASC competition to Plaintiffs, this

13   allegation provides no information about whether E3 has market power.  E3 may be Plaintiffs'

14   largest competitor while at the same time being the smallest player in the market.

15       Finally, assuming *arguendo*, that Plaintiffs may use anticompetitive effects as a surrogate

16   for market power outside the quick look context, in order for anticompetitive effects to be a

17   surrogate for market power, Plaintiffs must adequately plead injury to competition. As discussed

18   in the next section, Plaintiffs have not sufficiently pled injury to competition and therefore,

19   Plaintiffs cannot use anticompetitive effects as a surrogate for market power.  As the Court

20   explains, injury to Plaintiffs is not the same as injury to competition as a whole.  In order for

21   Plaintiffs' antitrust claims to survive, they must plead sufficient facts showing injury to

22   competition.

23                        2.   Injury to Competition

24       The Court finds Plaintiffs have not adequately alleged injury to the competition in the

25   "market as a whole."   The key to the "injury to competition" element is that "plaintiffs must plead

26   an injury to competition beyond the impact on the plaintiffs themselves." *Brantley*, 675 F.3d at

27   1198.   Plaintiffs must do more than alleged that their business has been injured by a conspiracy.

28   *Id.* at 1202 (finding alleged injury to competition not "plausible on its face" where "allegations

United States District Court
Northern District of California

1   show only that plaintiffs have been harmed as a result of the practices at issue, not that those

2   practices are anticompetitive").

3         Plaintiffs' still have not adequately alleged injury to competition and continue to focus on

4   the injury to themselves.  However, the decline in Plaintiffs' own revenue is not a proxy for the

5   broader ASC services market.  Moreover, Plaintiffs never allege that any competitors have exited

6   the market because of Defendants' actions.  *Prime*, 2013 WL 3873074, at *7   Thus, Plaintiffs

7   have failed to plead injury to competition.

### 3.  Plaintiffs Have Not Sufficiently Alleged a Per Se Antitrust Claim

9         All Defendants argue that Plaintiffs have still not adequately alleged the existence of a per se

10   violation of the Sherman Act.  E3 Mot. 13-17, ECF 66; Aetna Mot. 12-15, ECF 68.  E3 and Aetna

11   argue that Plaintiffs' per se claim fails for at least two different reasons: First, Plaintiffs have not

12   alleged a plausible horizontal boycott between their competitors, E3 Mot. 16-17, ECF 66; Aetna

13   Mot. 12-13, ECF 68; and second, Defendants argue that Plaintiffs have not sufficiently alleged

14   that Defendants' activities have characteristics of a per se boycott such as cutting off access to a

15   supply, facility, or market necessary for the victim to compete, possessing a dominant market

16   position, and the practices are not justified by plausible arguments that they enhanced overall

17   efficiency or competition, E3 Mot. 14-16, ECF 66; Aetna Mot. 13-15, ECF 68.

18         In opposition, Plaintiffs argue that it has adequately pled a per se violation of the Sherman

19   Act.  First, Plaintiffs disagree with Defendants' view of the law and argue that a horizontal

20   agreement need not be between competitors of the victim.  Opp. to E3 11-14, ECF 76; Opp. to

21   Aetna 12-14, ECF 75.  Second, Plaintiffs argue that Defendants' alleged characteristics of a per se

22   group boycott are not absolute but rather factors that are indicative of a per se group boycott.  Opp.

23   to E3 10-11, ECF 76; Opp. to Aetna 14-16, ECF 75.  With that caveat, Plaintiffs argue that they

24   have sufficiently pled Defendants' boycott has cut-off their access to a supply and market

25   necessary to survive as an ASC competitor, Defendants have dominant market positions, and that

26   there are no procompetitive justifications for Defendants' actions.  *Id.*

27         The Court finds Plaintiffs have not sufficiently alleged a per se violation of the Sherman

28   Act.  As to whether Plaintiffs must allege a horizontal agreement between competitors in order to

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1  plead a per se violation of the Sherman Act, the parties' dispute hinges on the continuing vitality

2  of the Supreme Court's 1959 decision in *Klor's, Inc. v. Boradway-Hale Stores, Inc.*, 359 U.S. 207

3  (1959).  In *Klor's*, the Supreme Court found that a retail store on Mission Street in San Francisco

4  was the victim of a per se group boycott, even though only one member of the conspiracy was a

5  competitor of Klor's.  *Id*. at 212.  However, as the Court in *In re Tableware Antitrust Litig.*, 484 F.

6  Supp. 2d 1059, 1068 (N.D. Cal. Mar. 13, 2007) explained, "[t]he [Supreme] Court's predilection

7  for designating group boycotts per se unlawful reached its highwater mark in *Klor's*."  Since then

8  the Supreme Court has pulled back from *Klor's* and been wary about fixing the per se label to all

9  boycotts.  *Id*. at 1068-69; *see* Richard A. Posner, *Antitrust Law* 238 (2d ed. 2001) ("A boycott, that

10  is, a group refusal to deal, used to be deemed a per se violation of section 1 of the Sherman

11  Act…The Supreme Court has wisely abandoned that position, which anyway was never taken

12  seriously.") (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) and *Nw. Wholesale*

13  *Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985)).

14           In *Nw. Wholesale*, the Supreme Court recognized that there was "more confusion about the

15  scope and operation of the per se rule against group boycotts than in reference to any other aspect

16  of the per se doctrine."  *Id*. at 294 (internal quotations and citations omitted).  The Court clarified

17  that per se approach generally applies to cases "involv[ing] joint efforts by a firm or firms to

18  disadvantage *competitors*…."  *Id*. (emphasis added).  In *NYNEX Corp. v. Discon, Inc.*, 525 U.S.

19  128, 135 (1998), the Supreme Court was even clearer and unequivocally held that the law "limits

20  the per se rule in the boycott context to cases involving horizontal agreements among *direct*

21  *competitors*." (emphasis added).

22           This Court follows the approach articulated by the Supreme Court in *NYNEX and Nw.*

23  *Wholesale* and Plaintiffs must allege a horizontal agreement between companies to disadvantage

24  direct competitors in order to invoke the per se approach.[2]  Plaintiffs have not alleged a horizontal

25  conspiracy between Aetna and United nor a conspiracy targeting Aetna's and United's own

26  competitors.  Instead of alleging a horizontal agreement between Aetna and United, Plaintiffs have

27

28  ───────────────
[2] Tellingly, Plaintiffs do not address the Supreme Court's decision in *NYNEX* in either of its
oppositions.

alleged a conspiracy in which E3 formed a hub connecting Aetna and United as spokes in a vertical agreement but there is no "rim." Plaintiffs fail to allege an "understanding between the horizontal competitors that each would participate in the boycott." *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1355 (N.D. Cal. 2013). As a result, Plaintiffs have not sufficiently alleged a *per se* violation of the Sherman Act.

### 4. Plaintiffs Have Not Alleged an Antitrust Violation Under a Quick Look Approach

Defendants argue that a quick look analysis should not apply to this case. E3 Mot. 17-20, ECF 66; Aetna Mot. 15-16, ECF 68. Plaintiffs respond that they have adequately alleged facts to invoke a quick look analysis. Opp. to E3 13-14, ECF 76; Opp. to Aetna 16-17, ECF 75.

The Court agrees with Defendants and finds Plaintiffs have not alleged facts giving rise to a quick look approach. "[T]his truncated rule of reason or 'quick look' antitrust analysis may be appropriately used where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir.2011) (internal quotation omitted). "Full rule of reason treatment is unnecessary where the anticompetitive effects are clear even in the absence of a detailed market analysis. But if an arrangement might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition, then a 'quick look' form of analysis is inappropriate." *Id*. As explained *supra* III.B.2.b.2, Plaintiffs have not alleged any effect at all on competition. Financial harm to Plaintiffs is not the same as harm to competition. In addition, the alleged conduct, the creation of a health coverage network not only has plausible procompetitive effects but has been found to be procompetitive by courts. Plaintiffs have not explained how the creation of health coverage network has no plausible procompetitive effects. *Barry v. Blue Cross of California*, 805 F.2d 866, 872-873 (9th Cir. 1986). Accordingly, a quick look analysis is improper under the facts of this case.

### C. State Law Claims

This Court has original jurisdiction over Plaintiffs' federal antitrust causes of action. FAC ¶ 83. Since the Court finds Plaintiffs have not adequately alleged their Sherman Act claims, the

United States District Court
Northern District of California

1    Court declines to exercise supplemental jurisdiction over the state law claims and dismisses them.

2        **D.    Statute of Limitations**

3        Defendants argue that Plaintiffs' antitrust claims are time-barred under the four-year statute of

4    limitations.  Aetna Mot. 24-25, ECF 68.  Plaintiffs argue that they have alleged an ongoing,

5    antitrust injury that is continual and accruing to this day.  As a result, Plaintiffs argue that the

6    statute of limitations has not expired.  Opp. to Aetna 24-25, ECF 76.

7            Under the "continuing violation" doctrine, "each overt act that is part of the [antitrust]

8    violation and that injures the plaintiff . . . starts the statutory period running again, regardless of

9    the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O Smith Corp.*,

10   521 U.S. 178, 189 (1997) (internal citations and quotations omitted); *Pace Indus. v. Three Phoenix*

11   *Co.*, 813 F.2d 234, 237 (9th Cir. 1987) ("A continuing violation is one in which the plaintiff's

12   interests are repeatedly invaded and a cause of action arises each time the plaintiff is injured.").  An

13   overt act restarts the statute of limitations if it: (1) is "a new and independent act that is not merely

14   a reaffirmation of a previous act"; and (2) "inflict[s] new and accumulating injury on the plaintiff."

15   *Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1989).

16           Since Plaintiffs have still not sufficiently alleged a plausible conspiracy, the Court cannot

17   adequately assess whether Plaintiffs' purported conspiracy is barred by the statute of limitations.

18   However, the Court is concerned that, as currently alleged, Plaintiffs' FAC does not sufficiently

19   plead "a new and independent act" as opposed to acts by Aetna and United that merely reaffirm

20   their decision to place Plaintiffs out-of-network.

21       **E.    Leave to Amend**

22       The Court has significant concerns over whether Plaintiffs will be able to sufficiently allege

23   adequate violations of the Sherman Act.  Especially troubling to the Court is how allegations

24   regarding market power and injury to competition have barely, if at all, improved in the FAC.

25   However, given Plaintiffs' representation that "information [has] came to light concerning the

26   depth and breadth…of the conspiracy which was previously unknown and not pleaded here," the

27   Court will grant Plaintiffs one last opportunity to amend their complaint as to Aetna.  Opp. to E3

28   25 n.14, ECF 76; Opp. to Aetna 25 n.12, ECF 75.

United States District Court
Northern District of California

22

United States District Court
Northern District of California

1    As to the E3 Defendants, the Court finds any further amendment as to Defendants E3

2    Healthcare Management, LLC, Alpine Healthcare, LLC,  Bascom Surgery Center, L.P., Campus

3    Surgery Center, L.P., Silicon Valley Surgery Center, L.P., and Waverley Surgery Center, L.P.

4    would be futile as the doctrine of res judicata precludes this suit against them.  As to Defendant El

5    Camino Ambulatory Surgery Center, LLC, since they have not yet shown they are in privity with

6    the other E3 Defendants and can invoke res judicata, the Court will grants Plaintiffs leave to

7    amend their complaint as to Defendant El Camino Ambulatory Surgery Center, LLC.

8    **IV.**     **ORDER**

9    For the foregoing reasons, IT IS HEREBY ORDERED that the Court GRANTS Defendant

10    E3's motion to dismiss WITH PARTIAL LEAVE TO AMEND and GRANTS Defendant Aetna's

11    motion to dismiss WITH LEAVE TO AMEND as to Plaintiffs' claim for a violation of Section 1

12    of the Sherman Act and the Court declines to exercise supplemental jurisdiction over Plaintiffs'

13    state law claims.  Plaintiffs shall file an amended complaint **on or before** August 17, 2016.

14    **IT IS SO ORDERED.**

15    Dated: July 18, 2016

16

17    BETH LABSON FREEMAN
       United States District Judge

23